# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-01886-SCT

*HYUNDAI MOTOR AMERICA AND HYUNDAI MOTOR COMPANY*

*v.*

*OLA MAE APPLEWHITE, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF AND WRONGFUL DEATH BENEFICIARIES OF DOROTHY MAE APPLEWHITE, DECEASED, CEOLA WADE, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF AND WRONGFUL DEATH BENEFICIARIES OF ANTHONY J. STEWART, DECEASED, AND KENNETH CORDELL CARTER, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF AND WRONGFUL DEATH BENEFICIARIES OF CECILIA COOPER, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/13/2015 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| TRIAL COURT ATTORNEYS: | J. COLLINS WOHNER, JR. |
| | PHILIP A. DOMINIQUE |
| | SARA BAILEY RUSSO |
| | ELIZABETH A. WEEKS |
| | KEITH W. McDANIEL |
| | ROBERT WILLIAM MAXWELL |
| | LINDSEY C. MEADOR |
| | RALPH EDWIN CHAPMAN |
| | JIMMY B. WILKINS |
| | C. KENT HANEY |
| | DENNIS C. SWEET, III |
| | KEVIN CHRISTOPHER NEWSOM |
| | THOMAS N. VANDERFORD, JR. |
| | WILLIAM O. LUCKETT, JR. |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |

ATTORNEYS FOR APPELLANTS:      J. COLLINS WOHNER, JR.
                               MICHAEL JAMES BENTLEY
                               JIMMY B. WILKINS
                               WALTER EDGAR McGOWAN
                               WILLIAM O. LUCKETT, JR.
                               ROBERT WILLIAM MAXWELL
ATTORNEYS FOR APPELLEES:        RALPH EDWIN CHAPMAN
                               EDUARDO ALBERTO FLECHAS
                               DANA J. SWAN
                               DENNIS C. SWEET, III
                               SARA BAILEY RUSSO
NATURE OF THE CASE:            CIVIL - WRONGFUL DEATH
DISPOSITION:                   REVERSED AND REMANDED - 03/11/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This case arises from a two-car accident in which a Hyundai Excel was traveling southbound on U.S. Highway 61 at a closing speed of 68 to 78 mph and, for reasons unknown, crossed the center line into the oncoming lane of traffic. Unfortunately for the three occupants of the Excel, that lane was occupied by a Lincoln Continental passenger car traveling northbound. None of the three Excel occupants survived the collision. This case is before this Court again following an earlier appeal and remand for a new trial. *See **Hyundai Motor Am. v. Applewhite***, 53 So. 3d 749 (Miss. 2011) ("***Applewhite I***").

¶2.     Following an adverse verdict,[1] Defendants moved for  a new trial. Subsequently, Defendants filed a supplemental motion for new trial, praying for an investigation of possible outside influences on the jury. The same jury rendered a $10.5 million verdict (comprised of

_____

[1] The trial at issue commenced on September 15, 2014, and concluded on September 26, 2014.

2

three identical $3.5 million verdicts awarded to each of the Plaintiffs.) A hearing on Defendants' original motion was set for April 20, 2015. Three days before the scheduled hearing date, Defendants filed the aforementioned supplemental motion. Defendants requested that the trial court "should allow discovery of Mr. [Carey] Sparks and his activities and then conduct an investigation and hearing into possible outside influences on the verdict. . . ." The trial court denied both requests, after receiving and considering what was later proved to be false testimony by the witness, Carey Sparks, and deceptions by one of Plaintiffs' counsel, Dennis Sweet, III. That ruling, after a deception was visited upon the trial court, resulted in a favorable ruling for the Plaintiffs. Defendants appealed that ruling, *inter alia*. Based on the record developed posttrial and presented in this appeal, this Court vacated the trial court's order denying relief and remanded not only for discovery, but we also ordered a separate Mississippi Rule of Evidence 606(b) hearing to be conducted after discovery was completed.[2]

¶3.     During the remand proceedings, multiple discovery disputes ensued before the trial court ultimately held two 606(b) hearings on October 30, 2018, and January 23, 2019 (nearly four years after the trial court's original denial of relief). The trial court expressly found that one of Applewhite's counsel, Dennis Sweet, III, misrepresented his relationship with Carey Sparks during the April 2015 hearing. It was not until a January 25, 2018 hearing, that Sweet admitted that he had paid Sparks to perform services during the *Applewhite* trial. This admission was made only after documents evidencing multiple payments to Sparks by Sweet surfaced in the discovery ordered by this Court. *See Applewhite*, 2017 WL 4684093. During

_____

[2] *See Hyundai v. Applewhite*, No. 2015-CA-01886-SCT, 2017 WL 4684093 (Miss. Oct. 19, 2017).

3

discovery, multiple witnesses, including six attorneys, testified that Sparks stated that he had knowledge of discussions of the jurors during the trial. Following the 606(b) hearings, the trial court issued a one-paragraph order, finding that the posttrial testimony of the jurors offered no evidence supporting Defendants' allegations.

¶4.    The total record before this Court evinces that a fair and impartial trial was not had. We find overwhelming evidence of actual impropriety, which destroys any confidence in the jury verdict. The facts developed in this record threaten the public's confidence in our system of justice. We find that this case is permeated by actual deception upon the trial court, which led to Plaintiffs' obtaining a favorable ruling. Such improper acts of misconduct leave a indelible stain on these proceedings. We are loathe to overturn jury verdicts, yet justice dictates a reversal and a retrial, unencumbered by extraneous assaults on our justice system. We considered the ultimate sanction of dismissal of this case with prejudice. We decline to impose such a severe  sanction, for no evidence suggests that any Plaintiff employed Sparks or had knowledge of Sparks's actions. But the judgment must be reversed. This case is remanded for a new trial.

### *Posttrial Proceedings*

¶5.    After this case was tried in September 2014, Defendants received communications that the verdicts were tainted by outside influences on the jury. Due to the influx of information by numerous disinterested persons, Defendants requested that the trial court permit a full and complete investigation into the actions of one Carey Sparks. A host of witnesses testified that Sparks repeatedly told others how jurors were influenced in this very case.

¶6. Initially, at a posttrial hearing in April 2015 before the trial court, Defendants offered three attorneys who met Sparks in Jackson at a Hinds County trial. The plaintiff in that trial was represented by Sweet. Attorney Kevin Gay testified that he recently had been in a trial with Sweet in Hinds County. Gay further related that during a break in that trial, Sparks introduced himself. Sparks informed Gay that he was helping Sweet with the Hinds County jury. Gay testified that Sparks "was trying to pitch me a resume as a jury consultant, slash, investigator, slash, case runner." Gay also testified that Sparks "told me . . . Sweet hires him to show up a couple of weeks before a trial in an area and preach revivals and get to know the people."

¶7. Gay's wife, Mary Margaret, also an attorney, and one of her associates, attorney Sara Budslick, also attended a portion of the Hinds County trial. Both of those attorneys were approached by Sparks, who identified himself as a preacher. Mary Margaret testified that Sparks told her that he

> worked for Sweet and was . . . helping pick a jury. That's what he did for a living. He was giving me a pretty good sales pitch. He said that Sweet paid him to go out and preach revivals two or three weeks out, when they pick a jury in different spots so that the jury would know him when they came in. Told me that they had juries that would come in, and women would cover their mouth and say, "That's the preacher that preached at our revival this weekend."
>
> [Sparks] told me that he had worked with Sweet on a case up in Clarksdale where it should have been a 21 million dollar verdict, but it was a 10 million dollar verdict.[3] That there were a lot of uneducated people up that way. People couldn't read and write. There was a lady on the jury that couldn't count. And they spent two days trying to teach her how to count, and that just never worked out.

---

[3] In closing arguments, Plaintiffs' counsel sought a total of $7 million per Plaintiff, a total of $21 million. The jury awarded each Plaintiff $3.5 million, a total of $10.5.

5

. . . .

He told me that his best friend called him. He traveled all over the Delta working, and that he never knew where he was going to be with Sweet, and that in fact, his best friend didn't even know where he was. He called him on the phone; said, "Are you up in Clarksdale?" He said, "I am." He said, "My aunt is on the jury."

. . . .

Um, he said something about the jury saying that, um, people didn't need to get any richer, which is why they wouldn't give them 21 million dollars.

¶8.   Budslick confirmed that she and Mary Margaret were approached by Sparks at the

Hinds County trial.

He, uh, introduced himself and talked about some politics and some other things. And then said that he was from Chicago, and he was a reverend or a bishop, a man of God of some sort. He said the best thing that you can do for a plaintiff's attorney is to go preach on the revival circuit shortly before trial. And then whenever the jurors, or potential jurors see you, they recognize you from that. And so you, I guess, get some notoriety from . . . doing the revivals.

Budslick further testified that Sparks said

a couple of weeks back, he had preached at a revival, and then he received a phone call from a friend that, apparently, the friend's aunt was sitting on this jury. And, um, I guess the friend was surprised that he was in Clarksdale and not in Chicago.

. . . .

And he mentioned that there was - - there was a difference in that particular case in Clarksdale between a 10 million dollar verdict and the 21 million dollars that was requested. And he said that it took them a number of days[4] because, I think he said, the jurors could not -- or someone on the jury couldn't read or write. So they spent a substantial amount of time working with that.

. . . .

_____

[4] The trial lasted eleven days.

6

And he -- I think he said, a couple of days that it took to you know, get the jury verdict.

He also said . . . someone on the jury said that they did not need to be that rich, I guess, in the difference between the 10 and 21 million.

¶9.    Gay testified that the weekend after completing the Hinds County trial, he decided to Google "Bishop" and "Clarksdale trial," and the first thing that popped up was the *Applewhite* case. "And the thing that surprised me about the case was that it was the verdict he told my wife about." Gay saw that an acquaintance, attorney Collins Wohner, was associated on the case. The following Monday, Gay called Wohner.

When I called Collins, I think I asked him, I said, this is going to come out of left field. Did you try a case, and was there a guy there that went by the name of Bishop. And that's when he said, "I got his name; I got his card." And he told me what his name was.

At that point, Gay suggested that Wohner might want to call his wife about what Sparks had told her at Gay's trial.

¶10.    At the posttrial hearing on April 20, 2015, Sparks was called as a witness by Plaintiffs' counsel Sweet. Sparks appeared voluntarily to rebut the Defendants' claim that the jury was improperly influenced. Sparks testified that his friend Richard "Dell" Cannon's aunt was on the jury.[5] Sparks admitted that he talked to Cannon about the trial but claimed that the call came after the conclusion of the trial. According to Sparks's testimony at the April 2015 hearing, he and Cannon[6] talked about Sparks's being at the trial but did not discuss any of the

---

[5] Dell Cannon's aunt Carol Brooks was selected as a juror in the *Applewhite* trial.

[6] Cannon is a resident of Arkansas.

7

jury deliberations. During that hearing, Sparks did not refute the statements attributed to him of his knowledge of the matters discussed by jurors, which he revealed to the three Jackson-area attorneys. Rather, Sparks categorically denied discussing jury deliberations with any of the three, characterizing their testimony as not only "wrong" but outright "false."

¶11.    At that same hearing, Sparks responded to a series of leading questions posed by Sweet. Sparks unequivocally denied working for Sweet during the *Applewhite* trial or in any other capacity. Sparks testified that he was not hired "in any capacity," was not paid "any money," and was not asked to "do anything" on the *Applewhite* case:

> [Sweet]: First of all, did you come see a trial up in Clarksdale when . . . I tried a case?
>
> [Sparks]: Yes, sir.
>
> [Sweet]: Were you hired as -- in any capacity in that trial?
>
> [Sparks]: No, sir.
>
> [Sweet]: Did I pay you any money in that trial?
>
> [Sparks]: No, sir.
>
> [Sweet]: Did I even ask you to come?
>
> [Sparks]: No, sir.
>
> . . . .
>
> [Sweet]: Did we ask you to do anything in that case?
>
> [Sparks]: No, sir.

Sparks offered that he was in Clarksdale at the invitation of his cousin Terris Harris. Attorney Terris Harris is an associate attorney in Sweet's law firm.

8

¶12.    On redirect examination by Sweet, Sparks again reassured the trial court that he had

*never* worked for Sweet and *never* been paid by Sweet:

> [Sweet]: Whether they are talking about how you are paraphrasing it, did you ever – well, did I *ever* ask you to work for me?
>
> [Sparks]: No, sir.
>
> [Sweet]: Did I *ever* pay you to work for me?
>
> [Sparks]: No, sir.

(Emphasis added.)

¶13.    Before the April 2015 posttrial hearing, the Defendants filed a supplemental motion

for a new trial, requesting relief from the judgment under Rule 60(b) of the Mississippi Rules

of Civil Procedure and for a posttrial hearing to investigate outside influences on the jury. The

Defendants offered two additional individuals to corroborate the three attorneys' testimony

that Sparks was involved in the *Applewhite* trial and pled that Sparks told Defendants'

counsel at the trial that he was "in association with Dennis Sweet." Douglas Kelly[7] submitted

an affidavit stating that, shortly after the *Applewhite* trial, Kelly overheard Sparks at a

restaurant "bragging about recently helping win a big verdict in Clarksdale and about having

a friend on the jury during the trial."

¶14.    Defendants also had interviewed the former sheriff of Coahoma County, Andrew S.

Thompson, Jr., who agreed to sign an affidavit about his knowledge of Sparks's dealings with

Sweet during the *Applewhite* trial. He said that Sparks told him that Sparks had picked

_____

[7] Kelly is an investigator for Defendants who was familiar with Sparks's activities surrounding the trial.

9

another good jury in the *Applewhite* case. Subsequently, Thompson refused to sign an affidavit after being instructed "by the Plaintiffs' counsel" not to sign one.

¶15. After offering substantial evidence regarding suggesting outside influence upon at least one juror, the Defendants again urged the trial court to reconsider and to allow discovery and for the trial court to conduct an investigation into improper juror contacts in the *Applewhite* trial proceedings. The trial court denied the Defendants' motions for new trial or any relief under Rule 60(b). For reasons not developed in the record, the trial court did not enter that order until December 2015. The trial court found that

> At the hearing on April 20, 2015, the testimony of the three attorneys and Mr. Sparks revealed that Mr. Sparks never indicated that he had personal contact with any juror before the trial was over, never spoke to any of the jurors himself before, during or after the trial, nor insinuated that he ever influenced the jury. The phone call from his friend regarding his aunt on the jury came two weeks after the trial. The witnesses could not testify as to the time of the alleged phone call, i.e., before, during or after the trial. And the witnesses testified that they did not take Mr. Sparks seriously during their conversation. Although a minimal standard of a good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred. The sufficiency of such evidence shall be determined by the trial court if a posttrial hearing is indeed warranted under these standards. *Gladney v. Clarksdale Beverage Co., Inc.*, 625 So. 2d 407, 419 (Miss. 1993). In the absence of threshold showing of external influences above, an inquiry into the juror verdict is not required. *Id.* The allegations against Mr. Sparks and his outside influence on the jury are speculative at best and the Court declines to grant additional discovery or to conduct an investigation into Mr. Sparks's influence.

Defendants subsequently appealed this finding and order.

¶16. During the pendency of the appeal and after due consideration of the briefs, records, and exhibits, a majority of this Court vacated the trial court's order and remanded the case for "full discovery and a complete investigation of any outside influences which may have

10

brought a taint of unfairness, real or perceived, to the . . . proceedings."[8] *Applewhite*, 2017 WL 4684093. Indeed, the record evinces real or actual impropriety in the proceedings. There can be no question that a specific, nonspeculative impropriety occurred. The taint of unfairness is more than just perceived but is actual or real.

### *Court-Ordered Discovery and Investigation on Remand*

¶17.    A status conference was held on December 5, 2017, to comply with this Court's remand order. Seven other hearings were held to address a plethora of discovery disputes. Hyundai took depositions and propounded numerous requests for written discovery and document production. During remand, the discovery uncovered that Sparks falsely had testified and that Sweet had misrepresented to the Court in the April 2015 hearing that Sparks was not and had never been a paid consultant for Sweet. In a subsequent order dated May 23, 2019, the trial court denied relief to Hyundai. The trial court failed to address the impact of the deception on the court. Whether that deception was (1) to obtain a favorable ruling, (2) a calculated move to conceal their relationship, (3) an attempt to frustrate a timely examination of influencing a juror, and/or (4) a cover up of improper acts, we know not. Nonetheless, it is not lost on the majority of this Court that by the time the remand order was issued and discovery was sought and obtained, a significant amount of evidence sought by Defendants was lost, destroyed, or otherwise unavailable.

### *Written Discovery and Document Production*

¶18.    During discovery, Sparks recanted his April 2015 testimony and admitted that Sweet

---

[8] Today's dissenters vigorously opposed the majority's decision to remand.

11

hired him, that he had received multiple payments from Sweet, and that he had provided assistance to Sweet "[d]uring the [*Applewhite*] trial . . . ." Document production revealed on its face that Sweet had compensated Sparks. Check number 4086, dated October 24, 2014, and drawn on Sweet's law firm's account, listed Sparks as the payee and noted in the memo "consultant fee - *Applewhite*." Another check, dated September 14, 2012—the same date that *Applewhite* was previously set for trial—was payable to Sparks for an event. Other checks dated in 2013 and 2014 were for travel expenses and other events.

¶19.    During a hearing on a motion to quash and a motion to compel held on January 25, 2018, the trial court found that Sparks and Sweet had misrepresented their relationship to the trial court at the April 2015 hearing, during which Hyundai had sought, *inter alia*, an investigation by the court. During that hearing, Sparks revealed that he had organized a community event in the Delta promoting Sweet's law firm and announcing Terris Harris's decision to join Sweet's firm. It was also admitted at that hearing that, before the *Applewhite* 2014 trial, Sparks had worked for Sweet in numerous other cases, including a number of GranuFlo cases in the Mississippi Delta in 2013 and another case in August 2014, one month before the *Applewhite* trial. It was further revealed that Sparks appeared at several other jury trials in cases in which Sweet was counsel of record. This testimony was in stark contrast to the testimony given by Sparks in April 2015, under direct questioning by Sweet, that Sparks never worked for Sweet and that Sparks never received payment from Sweet for any trial-related work.

¶20.    From the bench, the trial court held that at the April 2015 hearing, Sweet had  engaged

12

in a "deception on the Court" and ordered Sweet to self-report to the Mississippi Bar.

¶21.    In November 2017, two years and seven months after April 2015 hearing, and almost two years after the trial court denied the relief sought at the April 2015 hearing, [9] Defendants sought to discover cell phone records of Sweet, Sparks, Cannon, Harris, and Ralph Chapman,[10] pursuant to this Court's 2017 remand order. However, due to the elapsed time between the trial (September 2014) and the remand order of this Court (October 2017) and the Defendants' request for production (November 2017), cell phone records sought from the providers for the pertinent time periods had been destroyed pursuant to the providers' data retention policies. The Defendants were unable to obtain certain cell phone records predating May 1, 2016, from the providers. Defendants submit that they were denied cell phone records which could have confirmed that Sparks, Cannon, and Cannon's aunt Brooks communicated during the trial and that Defendants were prejudiced by the delay.

¶22.    Plaintiffs provided Defendants with a "summary" of some of Sweet's cell phone records. That summary established that Sparks and Sweet spoke on the phone and exchanged text messages on the afternoon of September 17, 2014—the third day of the *Applewhite* trial, just after the Applewhite family members had testified. The content of those text messages was not produced. The records further showed that Sparks called Sweet on December 17, 2014, and that both Sparks and Sweet attempted to call each other numerous times in February, March, and April of 2015. Sweet denied ever talking to Sparks and stated that he

---

[9] The trial court did not enter the order denying relief and an investigation until December 9, 2015, *supra* ¶ 15.

[10] Cocounsel for the *Applewhite* plaintiffs.

13

only attempted to call Sparks in April 2015 to determine "why he was telling these lies about me."

*Deposition Testimony*

¶23. The Defendants deposed Richard "Dell" Cannon, a person Sparks had described as his best friend, on June 18, 2018. During his deposition, Cannon refused to expound upon the nature and extent of his relationship with Sparks, repeating the phrase "I know him" in response to every question on the subject:

> Q. Okay. How would you describe your relationship with Sparks, with Mr. Sparks? Would you say that you're friends?
>
> A. I know him.
>
> Q. You know him, so more of an acquaintance.
>
> A. I know him.
>
> Q. Are you close to him?
>
> A. I know him.
>
> . . . .
>
> Q. All right. Would you consider [Sparks] a good friend or just someone you know, or how would you characterize him?
>
> A. I know him.

Cannon could not remember the first time he met Sparks or the last time he saw him. Cannon admitted that he sometimes saw Sparks in person, but claimed that it was "not that often" and that he "[n]ever see[s] him in Clarksdale," Cannon's hometown. Cannon denied discussing the ***Applewhite*** trial with Sparks:

14

Q. Did Carey Sparks . . . attempt to contact you ever about the *Applewhite* trial?

A. No.

Q. Not at any point has he ever reached out to you about the *Applewhite* trial?

A. No.

¶24. When confronted with Sparks's testimony that Cannon had called Sparks about the trial, Cannon then claimed that he had no memory of the call:

Q. And in that transcript Mr. Sparks said that you called him a couple of weeks after the *Applewhite* trial; is that what his testimony was?

A. That's what it says in his testimony.

Q. Do you recall him calling you?

A. I don't recall that at all.

Q. Okay. In his testimony, Mr. Sparks said that he told you, and I'm quoting Mr. Sparks, "Man, I heard you was in my home town and sharp as a tack. You dealt with a guy with a little bow-tie on and a guy with white hair and Ralph Chapman." Do you recall Mr. Sparks ever saying that to you?

A. I don't.

Q. Okay. I'm sorry, do you recall ever saying something like that to Mr. Sparks?

A. I don't.

¶25. When asked if he and Sparks ever exchanged text messages, Cannon first answered no and later said, "I don't think so." When confronted with telephone records showing that he and Sparks had multiple telephone calls and exchanged text messages after *Applewhite* was remanded, Cannon claimed that he could not recall any of the calls and texts either. Cannon also claimed that he could not recall whether he had called or texted Sparks in the time

between November 2017 and his deposition in June 2018.

¶26.    As for his aunt and *Applewhite* juror Carol Brooks, Cannon admitted that he and Brooks have a close relationship. Cannon said that he and Brooks "talk all the time." Cannon also admitted that Brooks called him on the morning of his deposition to ask if he had testified. When asked if he ever communicates with Brooks by text message, Cannon said, "I barely text with her."

¶27.    Despite their close relationship and frequent conversations, Cannon swore that he and Brooks had never spoken about the *Applewhite* trial. When confronted with records showing that he and Brooks had exchanged text messages on November 8, 2017, around the time that Cannon met with Defendants' attorney Bill Luckett in Pine Bluff, Arkansas about the *Applewhite* case, Cannon claimed that he could not recall the content of the text messages.

¶28.    On July 30, 2018, the Defendants deposed Andrew Thompson, the former sheriff of Coahoma County, another jury consultant for Plaintiffs during the *Applewhite* trial. Thompson testified that Sparks came to his office during the trial. Thompson was familiar with Sparks because the two did similar "consulting work" for attorneys. During their visit in Thompson's office, Sparks told Thompson that he was "doing some jury work" for Plaintiffs' counsel on the *Applewhite* trial. Sparks told Thompson that "he knew a family member of one of the jurors" and "that we're [Plaintiffs] going to win the trial." Sparks also told Thompson that he had preached at a Coahoma County church before the trial. Sparks discussed his relationship with Dell Cannon (whose aunt was on the jury), his preaching in the local community, and his confidence that Plaintiffs would prevail as they were connected. While Sparks never said that

16

he had "actual contact" with a juror, Thompson assumed that Sparks meant that he had contacted a juror through a family member.

¶29. In addition to the three Jackson attorneys, other witnesses came forward who corroborated the Sparks-Sweet connection. On July 31, 2018, Josephine Taylor, a parishioner at Sparks's former church in Cleveland, Mississippi, testified that Sparks held himself out as an investigator for Sweet. According to Ms. Taylor, Sparks told people that he was a "private investigator for Dennis Sweet" and that he "work[ed] for Dennis Sweet and Associates in Jackson." He also encouraged parishioners of the church to "get in touch with [him]" if they ever needed a lawyer. Ms. Taylor said that Sparks "bragged a lot" and that "if [Sparks is] working for the big shots in Jackson, he wanted the people to know that."

¶30. On the same day, Kenny Williams, who knew Sparks from Williams's campaign for Bolivar county coroner, offered that Sparks told him "that he was helping a lady get some money in Clarksdale, due to some accident or something . . . ." Williams did not remember every detail of their conversation, but he knew that Sparks was referring to a lawsuit: "[H]e mentioned that he was helping someone in Clarksdale with a case to try to get them some money." This conversation occurred sometime in 2015.

¶31. On August 10, 2018, Lyn Pruitt, a products-liability lawyer from Arkansas, testified that Sparks appeared at a Hinds County trial that she defended for American Optical Corporation in December 2014. Sweet was one of the plaintiffs' attorneys in that case. The ever present Sparks appeared once again at that trial. Pruitt testified that Sparks was in the courtroom multiple days and had two conversations with her. Pruitt testifed that Sparks

17

commented on her suit, and she assumed he might be a tailor. Pruitt testified that, when Sparks denied such,

> I said [to Sparks], "Well, what are you doing here?" And he said, "Well, I'm with Dennis." And I said, "Oh." And he said, "Yeah, I work with Dennis, and we go around sometimes to communities before these trials begin and have" -- "we may have" – a "set up a tent and have a barbecue or a fish fry." And I said, "Oh, okay. " I didn't question him about it any further.

Sparks expressly stated that he was "with Dennis" and "work[ed] with Dennis." During the American Optical trial, Sparks associated himself with that plaintiff, even sitting inside the well directly behind plaintiffs' lawyers and conversing with the plaintiff in the courtroom.

¶32.    Despite the multiple admissions and the confirmation by numerous witnesses that Sweet and Sparks had an established business relationship, Sparks continued to deny a relationship with Sweet. At his July 12, 2018 deposition, Sparks insisted that he had "never" been hired by Sweet outside of a September 2012 community event:

> Q. Now, Mr. Sparks, were you hired in any capacity by Sweet prior to the *Applewhite* trial?
>
> [Sweet:] We're going to object to the form. Over years, or when are you talking about? Put a time frame.
>
> Q. You can answer the question.
>
> A. I've never been hired by Sweet. I did some marketing for an event, but I never was hired by Sweet.
>
> A. And at the hearing, you said, "No."
>
> A. Yes.
>
> Q. Is that still true?
>
> A. That's still true.

18

Q. And Sweet asked you did he ever pay you any money?

A. Right.

Q. And you said, "No." Correct?

A. I said, "No."

Q. Is that still true?

A. That's still true. But I did community marketing as it relates to my cousin, Terris, as being a lawyer at our 50th high school reunion. And we gave out hot dogs to the community, and I guess Sweet sponsored it. And I made up fliers. And that's the relevance of that. But that was two years before this case even – even had anything that I came to know about.

However, when Sparks was confronted with checks which identified Sparks as payee and Sweet's firm the payor. Sparks's testimony abruptly changed. Only then did he admit that Sweet had paid him for services, including during the *Applewhite* trial. Only then did he admit that he had been paid to promote Sweet and his law firm and that he had organized community events in the Mississippi Delta before the *Applewhite* trial.

¶33. Sparks's admissions that he received, endorsed, and cashed checks from Sweet, corroborated the testimony previously given by a number of witnesses. Sparks also admitted that he used Sweet's picture in fliers and Facebook posts marketing promotional events for Sweet's law firm in the Delta. Only then did Sparks admit hosting an event just before the trial of another products-liability case, *Hutton v. Hyundai Motor America*, which was tried by Applewhite's co-counsel at the Bolivar County Courthouse in Cleveland, Mississippi, from October 6-16, 2012, and where Sweet's associate, Terris Harris, attended.[11] Sparks agreed that

_____

[11] Sparks also attended the *Hutton* trial, where Sparks intermingled with jurors, until a courtroom deputy saw him behind the bar with jurors and plaintiffs' counsel. The deputy

he had organized, promoted, and conducted at least three events in Cleveland in advance of the *Applewhite* and *Hutton* trials: a "Back to School Community Fest" on August 11, 2012, a month before the original *Applewhite* trial setting in September 2012; a "Delta Gospel Festival" on June 8, 2014; and another "Back to School Community Fest" on August 2, 2014, a month before the *Applewhite* trial, two months before the *Hutton* trial. Sparks also organized an event in Cleveland in September 2012, which was sponsored by Sweet and designed to promote Terris Harris's having joined Sweet's law firm.

¶34.    Sparks finally admitted that he (1) was aligned with Plaintiffs and their counsel, (2) had attended the *Applewhite* trial, and (3) appeared in the courtroom with Plaintiffs' team, performing tasks for Sweet during the *Applewhite* trial.

¶35.    Despite prior denials, Sparks changed his tune on other testimony. He admitted to speaking with Cannon "one or two times" *during* the *Applewhite* trial, but he then offered that the conversations related to basketball recruiting. Yet when Sparks was examined by counsel for the Applewhites, Sparks took another 180-degree turn, reverting back to his prior testimony that he and Cannon spoke only after the trial. Sparks also changed his testimony

---

escorted him away from behind the bar to an area for spectators. In chambers, counsel for Defendants expressed concern to the trial judge about Sparks's attendance at the trial. Cocounsel for Plaintiffs in both the *Applewhite* and the *Hutton* trials, informed the judge that Sparks was no longer in the building. He told the trial judge that

> I asked him to step outside when he came up there where we
> were. . . . Then later on we had told him it would be best if he
> was to exit, leave, because of the comments that had been made.
> . . . Actually, I didn't talk to him. I asked Terrance to tell him to
> – probably need to leave because of that, so he is not going to
> be here.

20

once again about the subject of his discussions with Cannon. At the April 2015 posttrial hearing, seven months after posttrial, Sparks testified that he and Cannon discussed his being in Clarksdale for the *Applewhite* trial. Yet at his July 2018 deposition, Sparks decided that they only discussed basketball recruiting. When confronted with the fact that he and Cannon had spoken on the phone and exchanged text messages in November and December 2017, shortly after this case was remanded for an investigation, Sparks claimed again that the calls were only about "recruiting." In addition to not being able to produce cell phone records, Sparks admitted using a prepaid cell phone, also known in some circles as a "burner phone."

¶36.    Contrary to Sparks's original testimony that the three Jackson attorneys had lied about what Sparks said to them at the Hinds County trial, Sparks decided in 2018 that he had told the Jackson attorneys that he worked for Sweet, while maintaining that the Jackson attorneys were lying about everything else that they said Sparks had told them.

¶37.    But the effusive Sparks did not exit this saga. Subsequent to Sparks's July 12, 2018 deposition, two additional witnesses came forward, each testifying that they had overheard Sparks discussing his role in the *Applewhite* proceedings in a public place. On February 1, 2018, approximately four months after the remand order,[12] during a hiatus in this Court's activities in this case,[13] two more members of the Mississippi Bar, attorneys Hunter and Allison Horne were having dinner at the Bonefish Grill in Madison, Mississippi. Sparks and

---

[12] *Applewhite*, 2017 WL 4684093

[13] While the case was on this Court's docket, the remand order stayed all proceedings in the appeal, awaiting proceedings in the trial court. Thus, from October 19, 2017, until December 6, 2018, when the motion for clarification was filed, the case remained dormant in this Court.

two dinner companions were seated in a booth next to the Hornes. The Hornes testified that they overheard Sparks discussing his testimony at the *Applewhite* posttrial hearing and deposition. Their testimony has not been contested or disputed.[14]

¶38. Horne, a former law clerk for the majority author,[15] testified later in the same year (September 7, 2018), that she overheard Sparks "make statements that sounded similar to the facts of *Hyundai v. Applewhite*." Horne testified that Sparks described the jury deliberations

---

[14] *See* Canon 3E(a) of the Mississippi Code of Judicial Conduct.

[15] Horne subsequently reported this encounter and requested and was granted leave from future participation in this matter. At that time, the case was pending in the trial court, and this Court was awaiting a ruling from the trial court and post-investigation filings by the parties. Counsel for all parties were informed on August 16, 2018, that Horne had been removed from participating in this case. No motion for recusal was filed until four months after Horne's deposition. On January 29, 2019, Eduardo A. Flechas filed a motion on behalf of Sweet seeking recusal of then Presiding Justice Randolph. The motion was not only untimely but procedurally infirm, lacking an affidavit under Rule 48(C)(a)(i) of the Mississippi Rules of Appellate Procedure. The motion was denied as it "fail[ed] to demonstrate facts that would cause a reasonable person knowing all the circumstances to doubt [the undersigned Justice's] impartiality in the litigation between the parties now before the Court. ***Wash. Mut. Fin. Group, LLC v. Blackmon***, 925 So. 2d 780, 797 (Miss. 2004)." *See* Order, ***Hyundai Motor Am. v. Applewhite***, 2015-CA-01886-SCT (Miss. Mar. 7, 2019). This order was filed only after Chief Justice Randolph gave notice to all justices, that *absent objection*, the order would be entered after ten days. Not a single justice registered an objection, with or without written statement. Of greater significance, neither Sweet nor the plaintiffs filed a motion for reconsideration, seeking review by the entire Court as provided in M.R.A.P. 48C(a)(iii). The recusal issue was finally decided after the Plaintiffs' time to seek reconsideration expired. Presiding Justice King's conclusion that Horne is a material witness is a bit disingenuous, given that Sparks has admitted that he lied under oath. King Dis. ¶¶ 107, 109, and 114. Not only did Sparks admit to being a liar, but Sweet testified that Sparks is a liar. That fact was conceded by Presiding Justices Kitchens and King in their objections to the remand order, in which Sparks is characterized as a braggart and liar. Sparks's claims of knowing about internal jury discussions during the trial was testified to by a host of others. Sparks's and Sweet's deception on the trial court has been admitted by both. Horne's testimony that Sparks lied under oath is merely corroborative, hardly making her a material witness.

22

in *Applewhite* to his dinner companions. He told them that the verdict should have been $20 million but ended up being $10 million. Horne heard Sparks saying:

> "they said I said a lady on the jury could not count." And then later, he said that . . . the verdict was ten million dollars, but it should have been 20 million dollars. Something like that.

¶39. Horne's spouse Hunter, a Madison County attorney, testified that he heard Sparks say that "the lawyers were asking me questions. And I started lying like an mf'er." Later, Hunter heard Sparks say that he "preached services," and Sparks referenced "revivals or sermons or something in North Mississippi and Louisiana." Hunter testified that Sparks also remarked that "he has the congregates [sic] go to a fellowship hall after the service and fill out forms . . . ."

¶40. Upon returning home, the Hornes found images of Sparks on the internet and confirmed that he was the same person they saw speaking about *Applewhite* at Bonefish Grill. The Hornes' testimony remains without challenge, contest, or dispute. *See* Miss. Code of Jud. Conduct Canon 3E(a), (applies only to disputed evidentiary facts).

¶41. It was not until October 17, 2018, during Sweet's deposition that he admitted that he had known Sparks since 2011. He testified that Sparks has never done "jury consulting" work for him. According to Sweet, Sparks just "showed up" at the *Applewhite* trial. Despite Sweet's claim to not have invited Sparks to Clarksdale, he acknowledged that Sparks stayed for the duration of trial after arriving on day two, roomed with Plaintiffs' trial team, and "started trying to make himself useful to [Sweet]."

¶42. Sweet denied having any conversations with Sparks about communications with

Cannon or juror Carol Brooks. Sweet also denied that he asked Sparks to preach ahead of the *Applewhite* trial, calling the assertions "ridiculous" and "made up," even though five witnesses—including four attorneys (Kevin and Mary Margaret Gay, Sara Budslick, and Lyn Pruitt) and Plaintiffs' own trial consultant and former sheriff (Andrew Thompson)—had already testified that Sparks disclosed to them his practice of hosting revivals or community events prior to Sweet's trials. According to Sweet, Gay concocted the Sparks story because he was "upset" after losing the Hinds County trial and was "trying to create some issue for his trial by raising Sparks . . . ." Sweet claimed that he had "nothing to do" with the three community events that Sparks had organized in the Delta in the months before the *Applewhite* trial, despite contradictory financial records and brochures.

¶43.    Sweet testified that he could not recall actually talking with Sparks on any occasion. Sweet denied that he had deceived the trial court through his questioning of Sparks at the April 2015 hearing, despite the trial court finding that the questions and answers were "misleading." Sweet offered an excuse to explain away the deception at the January 2018 hearing, allegedly having furnished the trial court with a prepared copy of Sweet's self-reporting letter to the Mississippi Bar.[16]

¶44.    According to Sweet, the "consultant fee" notation on his firm check to Sparks was a product of his law firm's inflexible accounting program. Sweet insisted that Sparks had not been a consultant; he had merely run errands for Sweet and Plaintiffs' trial team.

### *Rule 606(b) Hearings*

---

[16] A letter, purportedly presented to the trial court, was not marked as an exhibit and was not made part of the record before us.

¶45. After discovery was completed, the court summoned jurors for questioning pursuant to Rule 606(b) of the Mississippi Rules of Evidence. The court announced that it would question the jurors but allowed the parties to submit proposed questions. Plaintiffs' counsel proposed that the trial court begin its examination by reminding each juror that he or she was instructed not to discuss the case during the trial and that all jurors had assured the court that they had no contact with anyone. Defendants' counsel proposed that the trial court go directly to the key questions in the case, as jurors are already inclined to assure the court that they complied with its instructions.

¶46. Plaintiffs' counsel objected to Defendants' counsels' proposed questions, and the trial court sustained those objections, significantly striking a number of Defendants' counsels' questions. The court sustained Plaintiffs' counsels' objections to any questions about the jurors' discussion of damages.

¶47. The trial court followed Plaintiffs' counsels' suggestion on the order of questions, beginning each examination by having jurors confirm that they were "telling the truth" in September 2014 when they told the trial court that no one had contacted them while in recess during trial proceedings. After those admonishments, all of the jurors testified that neither Sparks nor anyone else had attempted to discuss the case with them. Two jurors recognized Sparks from the trial. Juror Laverna Gregory saw Sparks in the courtroom during the trial and believed he was part of the Plaintiffs' team. Juror Otta Conrad knew the name "Carey Sparks" and recalled his being in the courtroom, though she could not remember what day he was there. Although Sparks was in the courtroom throughout the trial, the other jurors testified that

25

they did not recognize him.

¶48. Juror Carol Brooks, Cannon's aunt, offered that she did not recognize Sparks's photo or know Sparks at all. When asked if she saw or spoke with Cannon during the trial, Brooks said, "Not that I'm aware of," and was quick to add: "But if – if I talked with him, we didn't talk about the trial." Brooks testified that she "didn't discuss [the case] with anyone."Brooks testified that she only sees Cannon "periodically," and sometimes she might not see him for four or five months. Cannon previously had testified that he and Brooks have a close relationship and "talk all the time." Both agreed that Cannon still uses a cell phone number that is on Brooks's cell phone plan, Brooks testified that they did not talk often and very seldom text each other.

¶49. While Cannon was clear that Brooks had called him on the morning before his deposition, Brooks testified as follows when asked about that call:

> [Court]: Are you aware that Mr. Cannon gave a deposition in this case?
>
> [Brooks]: He said he had to go to a – He said he had to go somewhere for court but I don't know what he did.
>
> [Court]: And did you speak with him on the morning of that deposition?
>
> [Brooks]: I'm not sure. I don't know.
>
> [Court]: Why would you speak with him before the deposition?
>
> [Brooks]: I don't know if I spoke with him.
>
> [Court]: You're not sure. But you spoke to him during that time because you remember he took a deposition, correct?
>
> [Brooks]: I – that was before. That was before he, uh, actually did the deposition, he told me he had to go and do something with the courts. I'm not

26

sure what he had to do. But I don't know the day he went or anything like that.

The trial court did not question Brooks about her text messages with Cannon on November 8, around the time that Cannon was visited by Defendants' counsel.

¶50. On May 23, 2019, the trial court filed a one-paragraph order addressing only the 606(b) hearings. Based on juror responses, he concluded "that no extraneous prejudicial information was improperly brought to the jury's attention and there was no outside influence improperly brought to bear on any juror." The trial court's order did not address the actual impropriety visited upon the court in April 2015 by Sparks and Sweet.

¶51. The parties have supplemented the appeal record with the discovery and transcripts and have filed supplemental briefs with this Court.

*Analysis*

¶52. "When considering a trial court's denial of a motion for a new trial, this Court's standard of review is abuse of discretion." *Cleveland Nursing & Rehab., LLC v. Estate of Gully ex rel. Bellmon*, 206 So. 3d 516, 521 (Miss. 2016) (internal quotation marks omitted) (quoting *Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986, 991 (Miss. 2012)). A new trial can be ordered when "to allow [the verdict] to stand would be to sanction an unconscionable injustice." *Noe v. State*, 628 So. 2d 1368, 1369 (Miss. 1993) (internal quotation mark omitted) (quoting *Wetz v. State*, 503 So. 2d 803, 812 (Miss. 1987), *overruled on other grounds by Bush v. State*, 895 So. 2d 836 (Miss. 2005)) .

¶53. Our legal system is the envy of the world. We recognize that it is not without blemish or imperfection. While such blemishes or imperfections generally are insufficient to require

reversals, glaring wounds caused by an assault on our treasured judicial system and juries are another matter. The rule of law remains our polestar. We must protect our judicial system from such attacks. "The right to a fair trial by an impartial jury is fundamental and essential to our form of government." *Johnson v. State*, 476 So. 2d 1195, 1209 (Miss. 1985); *see also In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); U.S. Const. amend XIV, § 1; Miss. Const. art. 3, § 14. But this right is only secure if the public has confidence in the integrity and impartiality of legal proceedings. *Great Am. Surplus Lines Ins. Co. v. Dawson*, 468 So. 2d 87, 90-91 (Miss. 1985). To preserve this fundamental right, courts must stand guard and be vigilant against even the appearance of impropriety, much less actual impropriety, in trial proceedings:

> Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness[,] for "public confidence in the fairness of jury trials is essential to the existence of our legal system. Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions."

*Hudson v. Taleff*, 546 So. 2d 359, 362-63 (Miss. 1989) (internal quotation marks omitted) (quoting *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1985), *superseded by statute as stated in Flowers v. State*, 158 So. 3d 1009 (Miss. 2014)). "[J]ustice must satisfy the appearance of justice." *In re Murchison*, 349 U.S. at 136 (internal quotation marks omitted) (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S. Ct. 11, 13, 99 L. Ed. 11 (1954)).

¶54.    This Court has previously addressed circumstances in which public confidence is eroded and the right to a fair trial is denied. A fair trial is denied when improper influences

28

are actually brought to bear on the jury. ***Gladney v. Clarksdale Beverage Co., Inc.***, 625 So. 2d 407, 413 (Miss. 1993). The right to a fair trial is defeated and reversal is required when a party's conduct creates an "appearance of unfairness" in court proceedings, even if proof is lacking that the party actually attempted to influence jurors. ***Dawson***, 468 So. 2d at 90 (quoting ***Lee v. State***, 226 Miss. 276, 286, 83 So. 2d 818, 821 (1955)). In ***Estate of Hunter v. General Motors Corp.***, 729 So. 2d 1264 (Miss. 1999), evidence was presented that General Motors hired a local mailman as a jury consultant. Although the plaintiffs were unsuccessful in proving their allegations that the mailman was hired "in order to gain otherwise protected information about the makeup of the jury venire," the Court held that "the hiring of the very same mailman who delivers the summonses to the jury brings a taint of unfairness, real or perceived, to the pre-trial proceedings." ***Id.*** at 1279. This Court opined that such an allegation "would be virtually impossible for the plaintiffs to establish . . . absent an admission by the parties involved." ***Id.*** The same is true in today's case, in which the taint of unfairness is real and perceived. In ***Estate of Hunter***, the Court concluded that

> this practice, which has a potential to bring discredit to the bar in the eyes of the public, should be strongly discouraged. Clearly, there are persons other than mailmen who are capable of providing insights into the makeup of jurors in the community, and the hiring of such mailmen could give the impression that they are being hired for their access to the summonses mailed to prospective jurors. These allegations of improper juror knowledge and of questionable pre-trial tactics likely do not constitute reversible error in and of themselves, but within the context of other errors committed at trial, we find these issues to be supportive of a reversal and remand for a new trial.

***Id.*** Unfairness is real in this case. Sparks's and Sweet's deception in the April 2015 hearing resulted in a favorable ruling in December 2015, a ruling which denied Defendants a timely

29

investigation. By the time the Defendants were granted the right to investigate by this Court in October 2017, evidence which may have established their case or, conversely, exonerated Sparks and Sweet had been destroyed.

¶55. In today's case, assuming arguendo that Defendants failed to prove that improper influences were actually brought to bear on the jury, a real or actual impropriety of offering deceptive testimony to the trial court is improper and unfair. The trial court acknowledged at its January 25, 2018 hearing that it had been deceived by Sparks and Sweet. Preventing the appearance of unfairness in trial proceedings is "of equal or greater importance" to ferreting out actual improper influences because "public confidence in the fairness of jury trials is essential to the existence of our legal system . . . ." *Dawson*, 468 So. 2d at 90 (quoting *Lee*, 83 So. 2d at 821). The trial court found no proof of actual improper outside influence based on juror responses only. This Court, in reviewing the testimony first given in an April 2015 hearing, all subsequent hearings, and the depositions and documents from the discovery, concludes that there was actual impropriety, a taint of unfairness, real and perceived, all of which is fatal to affirming the verdict procured in these proceedings.

¶56. This Court has recognized in other cases of outside influence that "it would be virtually impossible for [Defendants] to establish [actual impropriety] absent an admission by the parties involved." *Estate of Hunter*, 729 So. 2d at 1279. This Court has further held that jurors are not likely to reveal any bias. *Beech v. Leaf River Forest Prods., Inc.*, 691 So. 2d 446, 450 (Miss. 1997) ("Since jurors are aware that they are supposed to be impartial, they are unlikely to reveal any bias, even if they recognize it in themselves." (citing *Fisher v. State*,

30

481 So. 2d 203, 220-21 (Miss. 1985)). But in today's case, Sparks and Sweet admitted actual impropriety— deceiving the trial court—that resulted in a favorable ruling and delaying the investigation for years.

¶57. Sparks and Sweet created a false impression before the trial judge posttrial that they had no relationship and that Sparks had no role at trial. That actual deception successfully frustrated a timely investigation into Sparks's alleged misconduct infecting this case. Based on the complete record before us, the taint and unfairness that permeated these proceedings is readily apparent.

¶58. The overwhelming evidence in today's case supports a finding of both actual impropriety and the appearance of impropriety. Such conduct requires reversal. *Dawson*, 468 So. 2d at 91 (reversing jury verdict based on "a strong appearance of unfairness if not actual prejudice"); *Hudson*, 546 So. 2d at 362-63 (reversing jury verdict based on "appearance of unfairness"); *see also Estate of Hunter*, 729 So. 2d at 1279.

¶59. Deception is actual impropriety, not perceived. The deception on the trial court served its purpose well. The Plaintiffs obtained a favorable ruling, and Defendants were frustrated from beginning a timely investigation. We hold that the evidence does not support affirmation of the verdicts or the trial court's denial of the motions for new trial. The trial court abused its discretion and Defendants were denied a fair and impartial trial free from actual impropriety and/or the appearance of improper, outside influences. Considering all of the evidence before us, we conclude that allowing the verdict to stand would "sanction an unconscionable injustice." *Noe*, 628 So. 2d at 1369 (Miss. 1993) (internal quotation marks

31

omitted) (quoting *Wetz*, 503 So. 2d at 812 (Miss. 1987)).

*Conclusion*

¶60.    "This Court has repeatedly held that while litigants are not entitled to a perfect trial,

they are entitled to a fair trial." *Blake v. Clein*, 903 So. 2d 710, 718 (Miss. 2005) (citing

*Ekornes–Duncan v. Rankin Med. Ctr.*, 808 So. 2d 955, 959 (Miss. 2002)). Considering the

entire record before us, we find that this trial was neither perfect nor fair. The testimony,

admissions, and finding of deception on the trial court culminate in a finding that the

appearance of taint permeating these proceedings is overwhelming. A new trial,

unencumbered by such unlawful intrusion, is the only remedy.  Thus, the jury's verdict is

reversed, and this case is remanded for a new trial.

¶61.    **REVERSED AND REMANDED.**

**BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.  BEAM, J., CONCURRING WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND GRIFFIS, J.; COLEMAN, J., JOINS IN PART.  ISHEE, J., CONCURRING WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., COLEMAN, BEAM AND GRIFFIS, JJ. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.; COLEMAN, J., JOINS IN PART. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.  COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY  KITCHENS, P.J.  MAXWELL AND CHAMBERLIN, JJ., NOT PARTICIPATING.**

**BEAM, JUSTICE, CONCURRING:**

¶62.    While I agree with the majority opinion, I write separately because the opinion does

not address reporting allegations of attorney misconduct to the Mississippi Bar.

¶63.    Judges and lawyers are governed by the Mississippi Rules of Professional Conduct,

which ultimately this Court enforces.  All lawyers have a duty to not only uphold these rules

but to report any violation of the rules by others. Miss. R. Pro. Conduct 8.3(a). Whenever a court "receives information indicating a substantial likelihood that a lawyer has a committed a violation of the Rules of Professional Conduct[,]" it too must "take appropriate action." Miss. Code of Jud. Conduct Canon 3D(1), (2).[17]

¶64.    Moreover, I think it is important that the public knows that lawyers and judges hold each other accountable and are bound by the Rules and their oath to report misbehavior of judges and lawyers, as are all attorneys involved in any case.

¶65.    For these reasons, I would order that the clerk of this court transmit a copy of this Court's opinion to the Mississippi Bar for further investigation as necessary.

        **RANDOLPH, C.J., AND GRIFFIS, J., JOIN THIS OPINION.  COLEMAN, J., JOINS THIS OPINION IN PART.**

        **ISHEE, JUSTICE, CONCURRING:**

¶66.    I concur with the majority, but I write separately to emphasize that the justices of this Court have not only the authority but the *duty* to participate in cases when their recusal is not required. When a court is confronted by any case on any matter, the first question it must answer is whether it has the lawful authority to decide the case. If a court does have that

---

[17] Canon 3D(2) states:

> A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation to the Rules of Professional Conduct should take appropriate action.  A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects *shall* inform the appropriate authority.

(Emphasis added.)

33

authority, it must resolve that case for

> [t]he judiciary cannot, as the legislature may, avoid a measure, because it approaches the confines of the constitution. We cannot pass it by, because it s doubtful. With whatever doubt, with whatever difficulties a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously perform our duty.

*Cohens v. Virginia*, 19 U.S. 264, 404, 5 L. Ed. 257, 6 Wheat. 264 (1821). This duty of courts to hear cases forms the basis of the duty laid on *individual* judges to hear the cases brought before them. M.C.J.C. Canon 3B(1). Our canons state that "[a] judge shall hear and decide all assigned matters within the judge's jurisdiction except those in which disqualification is required." *Id.* This means that a judge "should not recuse himself on a unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges." *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981).

¶67. Therefore, without facts displaying some reasoned grounds "for questioning his or her impartiality, or allegations of facts establishing other disqualifying circumstances, a judge should participate in cases assigned. Conclusory statements are of no effect. Nor are counsel's unsupported beliefs and assumptions. . . . Nor does mere prior association form a reasonable basis for questioning a judge's impartiality." *Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985) (citations omitted). Indeed, "there must be an equilibrium between this need for impartiality and the need to prevent the frivolous and unnecessary disqualification of those

34

elected to perform judicial duties." ***Washington Mut. Fin. Grp., LLC v. Blackmon***, 925 So. 2d 780, 785 (Miss. 2004).

¶68. The upshot is that "[i]n the absence of a judge expressing a bias or prejudice toward a party or proof in the record of such bias or prejudice, a judge should not recuse himself." ***Hathcock v. S. Farm Bureau Cas. Ins. Co.***, 912 So. 2d 844, 852 (Miss. 2005). "It is a judge's duty to refuse to sit when he is disqualified but it is equally his duty to sit when there is no valid reason for recusation." ***Edwards v. United States***, 334 F.2d 360, 362 n.2 (5th Cir. 1964) (citing ***Banco Nacional de Cuba v. Sabbatino***, 307 F.2d 845, 860 (2d Cir. 1962), *rev'd on other grounds,* 376 U.S. 398, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964)). "Where the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." ***In re Aguinda***, 241 F.3d 194, 201 (2d Cir. 2001). "[A] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." ***Id.*** (internal quotation marks omitted) (quoting ***In re Drexel Burnham Lambert, Inc.***, 861 F.2d 1307, 1312 (2d Cir. 1988)).

¶69. I note also the matter of recusal of the then-Presiding Justice Randolph was presented on an untimely motion. Mississippi Rule of Appellate Procedure 48C provides that a motion for recusal "shall be filed within 30 days after the filing party could reasonably discover the facts underlying the grounds asserted." M.R.A.P. 48C(a)(ii). The motion was filed more than five months after this Court notified the parties that a law clerk had been disqualified from the case; more than four months after she had been deposed by the parties; and only after an en banc order was signed by then-Presiding Justice Randolph granting in part Hyundai's

35

motion to clarify. A party's failure to present a timely motion for disqualification operates as a waiver. *See* 48A C.J.S. *Judges* § 301, Westlaw (database updated Feb. 2021) ("If any party is dissatisfied with the action of the judge in disqualifying himself or herself, the party must make timely objection and resort to a remedy or it will be considered as waived." (footnote omitted))

¶70. Finally, I would point out that the issue of recusal has already been settled. The March 7, 2019 order denying the recusal motion was entered only after Chief Justice Randolph gave notice to all justices that, absent objection, the order would be entered after ten days. The order was reviewed by the entire Court, including the two now-dissenting, now-presiding justices, and not a single justice registered an objection. That should have been the end of it.

**RANDOLPH, C.J., COLEMAN, BEAM AND GRIFFIS, JJ., JOIN THIS OPINION.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶71. I respectfully dissent. This Court stayed the appellate process and remanded to the trial court for full discovery and a Mississippi Rule of Evidence 606(b) hearing on whether extraneous influences had been brought to bear on the jury. Despite Hyundai's having shown no extraneous influence on the jury, the majority reverses based on a finding of impropriety. Notwithstanding the majority's tone of outrage, the evidence is much too tenuous to require the extreme step of invalidating the jury's lawful verdict and ordering this aged case to be tried again. Certainly, this case does raise concerns of attorney misconduct. Those concerns are best addressed via the well-established procedures that begin with the Mississippi Bar. That process is underway. This Court can and should report to the Bar any further concerns

36

it may have. But I do not find that reversal of the jury's verdict is warranted in the absence of credible evidence that the misconduct influenced the jurors, or any of them, or altered the verdict. And my review of the evidence has led me to conclude that the proof surrounding Carey Sparks's activities comes nowhere near the standard for reversing a jury verdict established by our case law. I would proceed to review the other issues raised in Hyundai's appeal.

### A. Procedural History

¶72. I briefly outline the unusual procedural history of this case. More than six months after the September 2014 trial, Hyundai filed a motion for a new trial or a hearing based on possible outside influences on the jury. After a hearing on April 20, 2015, Hyundai requested further investigation and targeted discovery, including, *inter alia*, "relevant telephone records." The trial court found that, because Hyundai had not made a threshold showing of outside influences on the jury, discovery and an investigation were not warranted. Hyundai raised that issue in its appeal. Instead of adjudicating the issue along with the other appellate issues, as I advocated, a majority of this Court entered an order, to which I objected, that "remand[ed] this case for discovery and investigation, and a full and complete hearing to determine if 'extraneous prejudicial information was improperly brought to the jury's attention' or if 'an outside influence was improperly brought to bear on any juror.'" Order, ***Hyundai Motor Am. v. Applewhite***, No. 2015-CA-01886-SCT, 2017 WL 4684093, at *1 (Miss. Oct. 19, 2017) (quoting MRE 606(b)(2)). The Court instructed the trial court to conduct "full discovery" and a "complete investigation" of any outside influences that could have imbued the proceedings

with a real or perceived taint of unfairness, followed by a hearing and certification of a supplemental record to this Court. ***Id.***

¶73.    Hyundai filed a motion for clarification and on January 18, 2019, this Court issued a clarification order that cited Mississippi Rule of Appellate Procedure 14(a) and (b).[18] En Banc Order, ***Hyundai Motor Am. v. Applewhite***, No. 2015-CA-01886-SCT (Miss. Jan. 18, 2019). Noting that discovery had been completed, this Court ordered the trial court "to receive all evidence submitted by the parties, both testimony and documents, along with any objections to that evidence by the parties, and to certify same to this Court." ***Id.*** Citing Rule 14(b), the Court ordered the trial court to "complete its hearings pursuant to Rule 606(b)" and then to "make findings of fact related thereto" and "certify to this Court and supplement the record on appeal with the transcript of the hearing and any evidence proffered." ***Id.***

¶74.    In separate statements, I and my learned colleague, now-Presiding Justice King, disapproved of the Court's approach of "prohibiting it from making findings of fact (except

---

[18] Mississippi Rule of Appellate Procedure 14 provides as follows:

**(a) Finding of Fact by the Supreme Court.** The Supreme Court (and the Court of Appeals on those cases assigned to it by the Supreme Court) may try and determine all issues of fact which may arise out of any appeal before it and which are necessary to the disposition of the appeal, and, to this end, may, by order in each case, prescribe in what way evidence may be produced before it on the issue.

**(b) Finding of Fact by the Trial Court.** In the event the Supreme Court or the Court of Appeals so directs, the trial court may determine all issues of fact which may arise out of any appeal submitted to the trial court for a determination, and which may be necessary for the disposition of cases on appeal.

M.R.A.P. 14

as to the narrow Rule 606(b) issues) and prohibiting it from issuing a ruling or conclusions of law on the ultimate issues regarding the merits of Hyundai's jury influence arguments and motion for a new trial . . . ." *Id.* (King, J., objecting to the order with separate written statement).

¶75. On remand, after the trial court had completed the Rule 606(b) hearings at which the circuit judge questioned each juror and the alternate jurors, that court entered an order finding that the jury had not been exposed to outside influence or extraneous information. Per this Court's remand orders, Circuit Judge Smith's findings were limited to his observations of the jurors and their testimony at the Rule 606(b) hearing. He did not rule on the motion for a new trial because the Supreme Court of Mississippi had reserved that ruling for itself. I continue to disapprove of this Court's usurpation of the trial court's authority to rule on the motion for a new trial as expressed in my separate statement to the clarification order. En Banc Order, ***Hyundai Motor Am. v. Applewhite***, 2015-CA-01886-SCT (Miss. Jan. 19, 2019) (Kitchens, P.J., objecting to the order with separate written statement).

> B. *The motion for a new trial should be denied.*

¶76. Having reviewed the evidence, I am unconvinced that the verdict must be overturned to avoid a miscarriage of justice, notwithstanding the majority's framing of the evidence and its inflammatory rhetoric. The majority rests its decision on Attorney Dennis Sweet's conduct at the April 20, 2015, posttrial hearing at which he elicited Sparks's false testimony that Sparks never had worked for Sweet and never had been paid by Sweet. The resulting testimony was untruthful. During discovery, Sweet located four checks from his firm to

39

Sparks, including one check dated October 24, 2014, with the notation "consultant fee—Applewhite trial." Another check dated August 21, 2014, was for "Travel Expenses—Rosenburg." Another check was dated April 24, 2013, and referenced a "Cleveland event," and another was dated September 14, 2012, and also referenced a "Cleveland event." The trial court found that Sweet's representations that Sparks had not worked for him when, in fact, he had were a deception on the court, and the judge directed Sweet to self-report to the Mississippi Bar. At a later hearing, the trial court said that Sweet had given the court a copy of the letter he had sent to the Bar. Certainly, the trial court acted appropriately. I believe that this Court should, and indeed it is our duty, to refer any additional concerns we may have about attorney misconduct to the Mississippi Bar. M.C.J.C. Canon 3D(2) ("A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate authority.").

¶77. But attorney misconduct and attorney misconduct that casts doubt on the fairness of a trial and the sanctity of a jury's verdict may not be the same thing. The majority finds that Sweet's conduct at the posttrial hearing denied Hyundai the ability to perform a timely investigation and resulted in the destruction of cell phone records that might, or might not, have supported Hyundai's as yet unproven juror misconduct claims.[19] This, according to the

---

[19] Hyundai sought discovery of the cell phone records of Carey Sparks, Dell Cannon, Ralph Chapman, Terris Harris, and Dennis Sweet. Notably, Cannon, Chapman and Harris were customers of C Spire, which stated in a subpoena response that it does not retain the content of text messages. Thus, even if Hyundai had sought discovery from C Spire of the

40

majority, not only prejudiced Hyundai but caused a degree of unfairness so substantial that we must take the extraordinary step of reversing the jury's verdict although zero outside contact with jurors has been proven.

¶78.    Regarding allegations of juror misconduct, this Court has recognized two avenues for reversal: (1) a showing of improper outside influence or extraneous prejudicial information brought to bear on the jury and a reasonable possibility that the outside influence or extraneous prejudicial information altered the verdict; and (2) a more general claim that real or perceived unfairness existed that would erode public confidence in the judicial system. *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 418 (Miss. 1993); *Great Am. Surplus Lines Ins. Co. v. Dawson*, 468 So. 2d 87, 90-91 (Miss. 1985). The majority proceeds on the second theory. Both theories require proof. "[T]o prevent either party from 'fishing' for a way to change the undesirable conclusions rendered in their jury's verdict, a balance must be struck between the right to inquire into the jury verdict and the right of each juror to be free from harassment and secure in their verdict." *Gladney*, 625 So. 2d at 418. "The mere possibility that the jurors may have been influenced by some extraneous matter is not enough to set aside a verdict." *Allman v. State*, 571 So. 2d 244, 247 (Miss. 1990) (citing *Irving v. State*, 361 So. 2d 1360, 1368 (Miss. 1978)). Proof amounting to mere speculation is insufficient for reversal. *Id.* When a motion for a new trial lacks the support of adequate proof, "the presumption in favor of the correctness of the action of the trial court will prevail." *Brown v. State*, 252 So. 2d 885, 887 (Miss. 1971) (citing *Harvey v. State*, 218 So. 2d 9, 10

_____

cell phone records of Cannon, Chapman, and Harris at an earlier date, the content of their text messages would not have been available.

41

(Miss. 1969)).

¶79.	The question before us is whether Hyundai has presented evidence sufficient to undermine confidence in the verdict or that established a real or perceived taint on the trial. The majority reverses the verdict because it finds that Sweet's elicitation of false testimony from Sparks at the April 2015 hearing thwarted Hyundai's timely investigation of its juror misconduct claims, casting a taint on the jury's verdict itself, not merely on the posttrial investigation of Hyundai's unproven claims. To embrace the majority's reasoning requires piling speculation on top of conjecture. Nothing establishes that, had Sparks testified truthfully, the trial court would have ordered an investigation into juror misconduct. Even if Sweet's conduct could be construed as having hampered Hyundai's access to cell phone records before their destruction by the witness's respective cellular service providers, any resulting prejudice cannot possibly extend beyond the posttrial juror misconduct investigation. That is because Hyundai appealed from the trial court's denial of an investigation, and nothing prevented it from seeking a court order for preservation of any cell phone records that it deemed relevant in anticipation of this Court's granting it relief on appeal and remanding for an investigation. *See Humphrey v. Sallie Mae, Inc.*, No. 10-CV-01505, 2010 WL 2522743, at *1 (D.S.C. June 17, 2010). But Hyundai failed to do so and now blames the plaintiffs for its own lack of foresight. Considering Hyundai's own measure of responsibility for its lack of access to cell phone records, any unfairness attributable to Sweet hardly rises to the level required to reverse the jury verdict, especially given that no outside influence on any juror has been shown. To obtain the remedy Hyundai requests, a new trial, it must present evidence to

undermine confidence *in the verdict* or to establish a real or perceived taint *on the trial*. Because Hyundai's evidence is speculative, it falls short of this standard. Hyundai has established no connection between the jury's verdict and the shenanigans of Sparks or the misconduct of any attorney.

¶80.    First and foremost, every juror in this case testified that no one had contacted any of them and that no one had attempted to discuss the case with any of them. Every juror remembered the trial court's admonitions not to discuss the case with anyone during the trial, and every juror said that he or she had complied with that directive. Every juror said that he or she had responded truthfully when the trial court asked whether they had spoken with anyone or if anyone had tried to contact them before or during the trial. No juror knew Sparks. Two jurors did recognize Sparks from a photograph, having seen him the courtroom, and one of those jurors knew the name Carey Sparks. But no juror said that he or she ever had any contact with Sparks. Dell Cannon's aunt, Juror Carol Brooks, testified that she had not discussed the trial with anyone. She said she did not know Sparks and had been unaware that her nephew knew him. And she testified that her nephew Cannon never said that he had talked to Sparks during the trial.

¶81.    The majority discounts the jurors' uncontradicted testimony that no outside communications occurred on the ground that, because jurors "are aware that they are supposed to be impartial, they are unlikely to reveal any bias, even if they recognize it in themselves." Maj. Op. ¶ 56 (internal quotation mark omitted) (quoting ***Beech v. Leaf River Forest Prods., Inc.***, 691 So. 2d 446, 450 (Miss. 1997)). The majority's application of this conjectural concept

to the jurors in the present case is altogether speculative and it is not supported by any evidence whatsoever. The case it quotes discusses jurors' reluctance to reveal bias from pretrial publicity; it does not stand for a broad proposition that jurors' testimony about outside influences cannot be trusted. *Beech*, 691 So. 2d at 450. If that were true, the need for a Rule 606(b) hearing would be obviated. The trial court found that the jurors were credible, and nothing in the discovery materials persuades me otherwise.

¶82. Hyundai's claim of a real or perceived taint of unfairness is rooted entirely in Sparks's having bragged to others of his claimed activities in this case. Without repeating the lengthy renditions of the witness testimony, I summarize Sparks's communications. At an unrelated trial, he pitched himself to Attorney Kevin Gay as a jury consultant, investigator, and case runner. He told Gay and Attorneys Mary Margaret Gay and Sara Budslick that Sweet had paid him to preach revivals before trials so potential jurors would know him. According to Mary Margaret Gay, Sparks said that he had worked for Sweet on a case in Clarksdale, Mississippi. Sparks said the jury had returned a $10 million verdict that should have been a $21 million verdict and that "they spent two days trying to teach [a juror] how to count, and that just never worked out." Mary Margaret Gay testified that Sparks had said the jury had awarded only $10 million because they felt that people "didn't need to get any richer." He further told Mary Margaret Gay that his best friend had called him to say that his aunt was on the jury, but Sparks did not say when that phone call had occurred or whether the juror had received any communication about the case.

¶83. Attorney Sara Budslick corroborated Attorney Mary Margaret Gay's testimony about

what Sparks had said. According to Attorney Budslick, Sparks said he had gotten a phone call from a friend whose aunt was on the jury. He said that the jury had not awarded the $21 million requested by the plaintiffs but had awarded $10 million because someone on the jury said the plaintiffs did not need to be that rich. According to Budslick, Sparks said that "it took them a number of days because . . . the jurors could not—or someone on the jury couldn't read or write." Both Mary Margaret Gay and Budslick testified that Sparks never had said that he had contacted any juror in this case during the trial.

¶84.    Hyundai submitted an affidavit of its investigator, Douglas Kelly, representing that, in late 2014, he was dining at a restaurant in Cleveland when he heard Sparks "bragging about recently helping win a big verdict in Clarksdale and about having had a friend on the jury during the trial." Kelly had been present during a conversation between Sparks and Andrew Thompson, Jr., who testified by deposition that he had worked as a jury consultant for Ralph Chapman, one of the attorneys for the plaintiffs. Regarding that conversation, Thompson testified that on the third day of the two-week trial, Sparks had visited him in his office located near the Coahoma County courthouse. He said that Sparks "[k]ind of alluded that we're going to win the trial" and that Sparks "knew" a family member on the jury. Thompson testified also that Sparks had said that he had preached recently in Coahoma County but that Thompson was unfamiliar with the church Sparks had named. According to Thompson, Sparks never said he had contact with anyone on the jury.

¶85.    Attorney Hunter Horne testified that, at a restaurant on February 1, 2018, he overheard Sparks say that he had lied like a "m-fer" when questioned by attorneys. Horne also heard

45

Sparks say he had preached revivals in the Delta. Hunter Horne's spouse, Attorney Allison Horne, testified that on the same occasion she had heard a person whom she later identified as Sparks say "they said I said a lady on the jury could not count" and that the verdict had been $10 million but was supposed to be $20 million.

¶86.    Attorney Lyn Pruitt testified that Sparks had approached her at a trial in Hinds County and said "I'm with Dennis."  Sparks told her that, before trials, he would hold a barbecue or a fish fry in the community. Pruitt denied that Sparks ever told her that he was working on the case for Sweet. Josephine Taylor testified that Sparks told her he worked as a private investigator for Sweet. And Kenny Williams testified that, during a conversation about a year after the Applewhite trial, Sparks had told him that he was helping someone in Clarksdale get money after an accident. He had thought that Sparks had been referring to a current, not past, situation and could not recall whether Sparks had said the matter concerned a case.

¶87.    In his deposition, Sparks denied all wrongdoing and gave testimony that conflicted with his April 2015 hearing testimony. He opined that the attorneys who had come forward in this case all had lied about what he had told them. Sparks testified that he had never worked for Sweet but recanted when shown the checks from Sweet's law firm. Sparks testified that he had talked to Cannon about basketball recruiting during the *Applewhite* trial; later, he clarified that they had not talked during the trial but had done so afterward.

¶88.    A common denominator in this case is that no one who interacted with Sparks found him to be the least bit credible. The majority relies on the inherent credibility of the officers

46

of the court who heard Sparks talking about the trial.[20] But the credibility of those who heard Sparks bragging does not make what Sparks said to those esteemed persons true. Instead, the witnesses' common impression was that Sparks was a braggart and a liar motivated by inflating his own importance.

¶89.    Mary Margaret Gay testified that her impression was that Sparks had been looking for work and had been "blowing smoke" in an effort to get hired. She had thought Sparks "was[] a lot of talk," and she "didn't think a whole lot" about what he had to say. Budslick testified that she had not taken Sparks seriously; he was very flamboyant and outspoken, and she had thought Sparks was "just trying to impress two women that were in the courtroom, to be honest."

¶90.    The lay witnesses did not find Sparks credible either. Josephine Taylor testified that she had known Sparks for more than ten years and that he liked to tell tall tales and had a reputation for being untruthful. According to Taylor, Sparks "wanted to be a big shot," and he routinely bragged and name dropped. The majority cites the testimony of Andrew Thompson, Jr., who said that, during the trial, Sparks had "alluded" that the Applewhites were going to win because Sparks "knew" a family member on the jury. The majority writes that "[w]hile Sparks never said that he had 'actual contact' with a juror, Thompson assumed that Sparks meant that he had contacted a juror through a family member." Maj. Op. at ¶ 28. But Thompson's exact testimony was as follows:

Q. But [Sparks] didn't say he had any contact with that juror, right?

_____

[20] Hunter Horne and Allison Horne did not opine on Sparks's credibility.

A. My interpretation was he didn't have direct contact but he had a family member that was on that jury he knew of.

Q. Just knowing somebody doesn't mean he had contact, is that correct?

A. I'm kind of taking it a little bit further.

Q. That's just how you interpreted it?

A. Right.

Q. Did he say that he had actual contact with that juror?

A. No, he did not.

Q. That's just the way you interpreted it?

A. Right.

Q. But he didn't say he called them up or he called the relative and the relative called the aunt or whoever it was that was on the jury did he?

A. We didn't get into that.

Q. So you have no knowledge or no proof that he actually contacted a juror or a family member do you?

A. No direct proof.

While it may have been Thompson's impression that Sparks was insinuating that he had contacted a juror, Thompson did not believe a word of it. Thompson testified as follows:

Q. Did you really take him seriously about all this stuff he was saying?

A. You want me to answer that?

Q. Yes. Do you think he was serious?

A. Sometimes I think Sparks is full of it.

Q. You thought he was lying?

A. Yes.

¶91. What has been established is that Sparks bragged and boasted about being a great jury manipulator, but no one took him seriously. In addition to no witness' having testified that he or she found Sparks credible, the record of what occurred during the *Applewhite* trial does not match what Sparks purportedly said about the jury's deliberations. Nor does it align with or support Hyundai's theory that Sparks, at the behest of Sweet, had his friend Cannon contact his aunt, Juror Carol Brooks, during the trial. According to Attorney Mary Margaret Gay, Sparks had said that a lady on the jury could not count, and "they spent two days trying to teach her how to count, and that just never worked out." But the trial transcript establishes that the jury deliberated for two and a half hours, not two days. And because the trial court confirmed on the record that a bailiff had taken the jurors' cell phones, no one could have telephoned a juror during deliberations. According to Attorney Budslick, Sparks had said that a juror could not read or write. That statement by Sparks is belied by Mississippi's literacy requirement for jury service, by which trial courts ascertain juror literacy by means of a statutorily mandated form each juror is required to complete personally. Miss. Code Ann. § 13-5-1 (Rev. 2019). Further, Sparks's statements did not exclude the possibility that, even if he had any actual knowledge of the jury's deliberations, he had obtained it *after* trial. Furthermore, Sparks's claim that he knew of a friend's relative who was serving on a jury, then telling others about it, would not be unlawful conduct. There is no evidence that Sparks communicated with any juror, directly or indirectly.

¶92. Hyundai puts much emphasis on the testimony of Sparks, Cannon, and Cannon's aunt,

49

Juror Carol Brooks, in furtherance of the notion that Cannon had agreed to a request by Sparks to contact his aunt and that she had agreed to influence the other jurors in the Plaintiffs' favor. According to Attorney Mary Margaret Gay, Sparks had boasted that his best friend's aunt had been on the jury. But Cannon did not agree that Sparks was his best friend. Cannon, an assistant college basketball coach in his mid-twenties, testified that the only thing Sparks ever had contacted him about was basketball recruiting. He related that Sparks, a middle-aged man, had dated a woman whose sons were high-level basketball players that he wanted to draft. Cannon recalled that he had discussed that matter with Sparks on several occasions. The majority casts Cannon's testimony into doubt because he repeatedly said "I know him" when asked about the nature of his relationship with Sparks. The record reflects that Cannon initially had been uncooperative with attempts to depose him because he said he knew nothing about the case, had nothing to do with it, and was annoyed with the intrusion of the matter into his life. His answers of "I know him" appear to reflect frustration with badgering questions, not an attempted subterfuge. And although Sparks and Cannon communicated on a few occasions during the lengthy investigation of alleged jury tampering in this case, that circumstance is much too insubstantial and too ill defined to support a reasonable conclusion that those communications concerned a jury tampering cover-up.

¶93.    Hyundai places import on Cannon's having said that he and his aunt spoke regularly although the aunt, Brooks, said they did not talk very often. Additionally, it emphasizes that, although Cannon remembered that Brooks had called him on the morning of his deposition, Brooks said that Cannon had told her he had to attend the deposition, but she could not

50

remember whether the conversation had been that morning or earlier. Neither Cannon nor Brooks testified that they had discussed Cannon's deposition testimony, and there is no proof to the contrary. Despite Hyundai's attempt to characterize the testimonies of Cannon and Brooks as a smoking gun, the evidence is just not very probative. The differing recollections of family members about how often they talked to each other does not make a jury tampering conspiracy between them more or less likely. Hyundai seems to insinuate that Cannon and Brooks concocted a scheme to coordinate their testimony yet did so incompetently because their testimony did not match. Viewed objectively, the evidence falls far short of proving that Cannon and his aunt colluded to affect the deliberations or the verdict of the jury or that they did anything to cover up activities of that sort.

¶94. Attorney Dennis Sweet testified that he had known Sparks since 2011. He said he never had used him as a jury consultant, had him review a jury list, or had him provide information about jurors. Sweet said that Sparks held himself out as a political consultant, and Sweet had hired Sparks on occasion to perform odd jobs. He testified that no one had instructed Sparks to attend the trial, and Sparks had been invited to attend by one of the plaintiffs' attorneys, Terris Harris. Sweet said he had asked Sparks to make a couple of trips to Jackson for him to pick up suits and items from the law firm. Sparks also had gone grocery shopping for the plaintiffs' trial team. According to Sweet, Sparks had served no purpose in the *Applewhite* trial. He said he never had discussed the jurors with Sparks, including whether Sparks knew a juror. Sweet testified that, if Sparks had told him that he knew a juror, he would have reported it to the court.

¶95. Sweet testified that, after the *Applewhite* trial, Sparks had showed up at his law office asking for compensation for the odd jobs he had performed during the trial, and Sweet had paid him $1,000. He explained that the other three checks his law firm had written to Sparks, two prior to the trial and another afterward, also concerned miscellaneous matters. One $500 check written the year after the trial was compensation for Sparks's driving Sweet to Atlanta to take a deposition in the *Rosenburg* case. Another check in 2012 for $2,000 was for supplies for Sparks's coordination of an event for Attorney Terris Harris. The last check from 2013 paid Sparks $628 to hand out flyers for marketing purposes involving Granuflo lawsuits. Attorney Sweet contended that he had not intentionally misled the court at the April 2015 hearing when he elicited testimony from Sparks that he never had paid him. He said his questions were meant to focus on whether Sparks had worked as a jury consultant in the *Applewhite* case. Sweet testified that, after searching through the thousands of checks his firm writes every year, he located the four checks to Sparks and produced them.

¶96. I do not condone Attorney Sweet's misrepresentations to the trial court at the hearing on April 20, 2015. But the evidence that he hired or directed Sparks to influence jurors is less than slight. Hyundai adduced evidence that Sweet's law firm had paid Sparks four times over the course of Sweet's interaction with him. The amounts paid, in point of time, corresponded with the jobs Sweet said that Sparks had performed. Harris's and Sweet's cell phone records, and the phone records of Sweet's law firm for a nine-month period beginning August 1, 2014, were produced. No calls between Sparks's cell phone and Harris's cell phone were identified.

Sweet texted Sparks on the third day of the *Applewhite* trial,[21] and the two also talked on the phone that day. That is consistent with Sweet's testimony that he had Sparks perform odd jobs during that trial. The records show that Sparks telephoned Sweet's firm once in 2014, a call on December 17, 2014, that lasted forty seconds. Sweet said that at that time it was likely Sparks had talked to the receptionist; he denied talking to Sparks on that occasion. Then in February 2015, Sparks had tried to call Sweet's cell phone four times, but there was no answer. Leading up to the hearing of April 20, 2015, on March 5, 2015, Sweet tried to call Sparks several times. And Sparks called Sweet four times on April 29, 2015. The elapsed times of those calls were so short that no conversation could have occurred. Sweet testified that the reason he had called Sparks in 2015 was to ask "[w]hy in the world he would be out here telling these lies about me."

¶97. The evidence surrounding the purported revivals likewise is far from compelling. Sparks allegedly boasted to several witnesses that his work for Sweet included holding revivals and then appearing at trials in hopes that jurors would recognize him and thereby be inspired to vote in favor of the plaintiffs. Sparks testified about four events he claimed to have hosted in Cleveland, Mississippi. Notably, the trial under review occurred in Clarksdale, Mississippi. One of Sparks's events in Cleveland, Mississippi was in September 2012. It was undisputed that Sweet had sponsored that event to promote Attorney Terris Harris as a new member of the law firm. Sweet testified that he had paid Sparks $2,000 to purchase food and other supplies for that event. Sparks testified about three other events he had organized in

---

[21] The content of the text messages was not produced in discovery.

53

Cleveland. The majority casts nefarious aspersions on those events by pointing out that they preceded the first *Applewhite* trial and the Bolivar County trial in ***Hutton v. Hyundai Motor America***. But no evidence other than the bragging of Sparks, a proven liar, hinted that Sweet had anything to do with those events. No phone calls or payments linked Sweet, his law firm, or any attorneys with whom he worked to those events. Attorney Sweet was not associated in the ***Hutton*** case; that case was tried by Sweet's co-counsel in the *Applewhite* case, Attorney Ralph Chapman. No witness said that Sparks had claimed to have been hired by Chapman. Hyundai did not seek to depose Chapman in the present case. Sparks was present at the ***Hutton*** trial. But only speculation could support the notion that Sweet had directed Sparks to hold revivals in advance of the ***Hutton*** trial. And nothing other than Sparks's notorious and untrustworthy self-promotion supports the conjecture that Attorney Sweet had hired him to hold events before the *Applewhite* trials for the purpose of influencing potential jurors.

¶98.    It is far-fetched to imagine that any attorney would expect to influence potential jurors by hiring a preacher to hold revival meetings in advance of a trial, hoping that some of those summoned for jury duty would have attended the revival, that some of those attendees would end up on the jury, and that they would recognize the preacher sitting behind the plaintiffs and then decide to violate their oaths and award money to the plaintiffs. Attorney Sweet found Sparks's representations nonsensical. He testified that "[n]o one would take this seriously. You have to have a little bit of stereotype of black people in you to even give it credibility, that you can go to some revival somewhere and black people going to get the message out in

54

the community to vote for Dennis Sweet." Sweet testified that "[to] have some . . . minister out talking about I'm frying fish and holding revivals to win cases, it's insulting. It's not true and it's insulting."

¶99. As the plaintiffs point out, the population of Coahoma County in 2010, according to United States Census Bureau statistics, was 26,145. Coahoma County, Mississippi, https://www.census.gov/quickfacts/fact/table/coahomacountymississippi,US/PST045211(last visited Jan. 18, 2021).The percentage of those eighteen and under was 27%. *Id.* As Applewhite argues, assuming that 68% of the county's population was over the age of twenty-one and eligible for jury service, that means there were approximately 18,000 people who potentially could have been called for jury duty for the ***Applewhite*** trial. The plaintiffs produced a Google search that showed 116 churches in Coahoma County. It is hard to imagine that, even if a preacher held a church revival in advance of a Coahoma County trial, any of the eventual jurors would be in attendance at the revival and then, at the trial, remember the preacher and on top of that be moved by the preacher's presence at trial to violate their oaths and vote for the plaintiff. Sparks's claims about holding revivals as a mechanism for juror influence simply are not credible. Indeed, no one who heard them believed him.

¶100. The majority, in evident recognition that the evidence in this case is insufficient to support the conclusion that improper influences improperly were brought to bear on a juror, nonetheless finds that reversal is warranted based on the impropriety that occurred when Sweet elicited false testimony from Sparks at the April 2015 hearing. But it applies the cases it cites far beyond their intended reach. In every case in which the verdict was reversed, some

55

direct contact with jurors was established that was found to have created an appearance of impropriety or unfairness. In *Great American Surplus Lines v. Dawson*, 468 So. 2d 87, 88 (Miss. 1985), the defendants moved for a mistrial. At the hearing, testimony established that, before jury selection, with the potential jurors gathered around them, the plaintiff and two witnesses had been talking and joking, and the jurors had been laughing at what they said. *Id.* at 88-90. This Court reversed the trial court's denial of a mistrial, finding that the occurrence had "threaten[ed] public confidence in the fairness of jury trials . . . ." *Id.* at 90 (quoting *Lee v. State*, 226 Miss. 276, 286, 83 So. 2d 818, 821 (1955)).The Court said that

> the conduct of the plaintiff and two of his material witnesses in the presence of the jury indicates there was at the very least a strong appearance of unfairness if not actual prejudice. Besides having the potential of fostering bias in the jury, such behavior trivializes a serious matter: the disposition of a lawsuit. A lawsuit may be joked about in many places, but not in the courtroom in the presence of those who have been voir dired and sworn to decide the case.

*Id.* at 91.

¶101.   The Court relied on several similar cases in reaching its conclusion. In *Lee*, the sheriff had served as jury bailiff and also had been a material witness in the case, giving rise to an appearance of unfairness. *Lee*, 83 So. 2d at 821. In *Smith v. State*, 251 Miss. 241, 247, 169 So. 2d 451, 453-54 (1964), the Court found that public confidence in the judicial system had been threatened when the deputy sheriffs who had assisted with jury selection then acted as jury bailiffs. *Perkins v. State*, 244 So. 2d 414, 415 (Miss. 1971), was reversed because a sheriff who had testified later was seen conversing with a juror. In *Dunn v. State*, 264 So. 2d 823, 826 (Miss. 1972), a sheriff who had been a witness then spent the night at the hotel where jurors were sequestered.

¶102. The majority relies also on *Hudson v. Taleff*, 546 So. 2d 359 (Miss. 1989), in which the plaintiff sued her ophthalmologist for medical malpractice. *Id.* at 360. In that case, 48% of the twenty-five person jury pool "had some connection with Dr. Taleff, his medical partners or his attorney," with several members of the pool having been patients of Dr. Taleff's. *Id.* at 361-62. The trial court allowed two of the plaintiff's for-cause challenges and, after using all her peremptory challenges, two jurors with a connection to Dr. Taleff remained. *Id.* at 362-63. The Court held that, "because of the 'statistical aberration' of the makeup of the venire and the strong likelihood that the opportunity for undue influence over other jurors in this case was too great, this Court holds that the trial jury was not impartial." *Id.* at 363.

¶103. The majority's primary authority, *Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264 (Miss. 1999), in fact supports the conclusion that the evidentiary showing in this case does not amount to reversible error. In *Estate of Hunter*, the plaintiffs alleged that the defendants had hired the mailman who had delivered jury summonses as a jury consultant. *Id.* at 1279. The Court found that, "even if no improper conduct actually occurred, . . . the hiring of the very same mailman who delivers the summonses to the jury brings a taint of unfairness, real or perceived, to the pre-trial proceedings." *Id.* The Court "strongly discouraged" a party's hiring of a mail delivery person to provide information about potential jurors. But the Court did not find that the alleged hiring of the mailman was reversible error. Instead, the Court said that "[t]hese allegations of improper juror knowledge and of questionable pre-trial tactics *likely do not constitute reversible error in and of themselves . . . .*" *Id.* (emphasis added). The Court reversed on other grounds. *Id.*

¶104. In each of the above cases in which the Court reversed due to an appearance of unfairness that threatened public confidence in the judicial system, the jury actually was exposed to some presumptive influence such as a witness who then acted as a jury bailiff, a witness who talked to a juror, a witness who spent the night where jurors were sequestered, a party and witnesses who talked and laughed in jurors' presence, or a defendant who was a physician connected in a treating capacity or otherwise with jurors. Hyundai has not shown that a juror in the *Applewhite* case was exposed to any such influence. Only speculation could support a conclusion that at the direction of Sparks, Cannon contacted his aunt, Juror Carol Brooks, and convinced her to advocate for Applewhite. Nor did Hyundai present sufficient evidence to support a reasonable inference that Sweet hired Sparks to hold revivals in an attempt to influence prospective jurors. Hyundai's arguments, like those in *Estate of Hunter*, amount to mere allegations that do not justify reversal. Nothing close to the juror influences that we have found sufficient to constitute reversible error was proven to have occurred in this case.

## C. Conclusion

¶105. Hyundai's evidence in support of its claims of jury misconduct falls far short of sufficiency. Indeed, the majority does not find that Hyundai's evidence was sufficient to show that any outside influence was brought to bear on any juror or that any juror was exposed to extraneous prejudicial information. Instead, it reverses the jury's verdict based on a taint of unfairness generated, in its opinion, by Sweet's deception at a posttrial hearing that delayed an investigation of Hyundai's jury misconduct allegations, causing the loss of cell phone

records due to the passage of time. I find this argument unpersuasive. Hyundai had asserted the relevance of the cell phone records during the posttrial proceedings, and it easily could have taken steps to preserve that evidence pending appeal. But Hyundai chose not to do so, and as a result it bears significant responsibility for its later inability to obtain discovery of the cell phone records. Prejudice directly attributable to Sweet's misconduct was minimal. Under the circumstances, Sweet's posttrial misconduct, which he was ordered to report to the Mississippi Bar, falls drastically short of what should be sufficient to impose the extreme sanction of reversing the jury's verdict given that no outside influence on any juror was shown. Litigants are entitled to a fair trial, not a perfect trial, *Blake v. Clein*, 903 So. 2d 710, 718 (Miss. 2005), and I do not believe that Hyundai has presented sufficient evidence to show that its right to a fair trial was impaired. I would deny the motion for a new trial, adjudicate Hyundai's other appellate issues, then issue an opinion in this case. As a final note, I agree with Presiding Justice King that the majority writer should recuse based on the participation of his law clerk and her spouse as material witnesses in this case. Given that the majority's only basis for reversal is real and/or perceived impropriety, his decision not to recuse seems highly inconsistent. I join Justice Coleman's dissent in all respects except for his position on the recusal issues.

**KING, P.J., JOINS THIS OPINION. COLEMAN, J., JOINS THIS OPINION IN PART.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶106. In the case at hand, this Court reverses a jury verdict based solely on the Court's conclusion that the factual circumstances and posttrial attorney misconduct led to an unfair

or tainted jury verdict. Presiding Justice Kitchens has written a well-reasoned dissent on the merits of whether such unfairness or taint exists sufficient to overturn a jury's verdict. I agree that we should not impose jury verdict reversal as a sanction for posttrial attorney misconduct. However, because the majority reverses not based on any *actual* influence on the jury or taint of the jury verdict, but merely upon its opinion that posttrial attorney misconduct somehow conjured unfairness or taint in the jury verdict, I am compelled to express my concern about the appearance of unfairness and taint in this very Court's decision. Two of the nine justices on this Court have ties to a married couple participating as material witnesses in the issue of potential jury influence, with one of those ties being particularly close. These ties are sufficient that a reasonable person would harbor doubts about this Court's impartiality, thus creating an appearance of partiality or bias, even without proof of actual bias. As such, I find it concerning that this Court uses reversal of a sacred jury verdict as a sanction for posttrial attorney misconduct, yet refuses to take an honest look at how this Court's judgment will be perceived by the parties and the public.

¶107. In February 2018, Allison Horne, a law clerk for then-Presiding Justice Randolph, who was working on this very case for him, was allegedly randomly seated next to a material witness in this case at a restaurant. She allegedly overheard that witness talking about a very case on which she happened to be working. The primary reason she took note of the alleged conversation was due to her work on this case for this Court. Not until six months later did this Court send a letter to the parties advising them that Horne may have information regarding the case and that she would recuse from the case. The letter did not advise the

parties regarding for which justice of this Court Horne worked.

¶108. Applewhite eventually filed a motion for now-Chief Justice Randolph's recusal. In a single justice order, the justice denied the motion primarily based on grounds that Applewhite did not comply with the recusal procedures outlined by the Mississippi Rules of Appellate Procedure. *See* M.R.A.P. 48C. Alternatively, the order found that Applewhite did not present sufficient facts that would cause a reasonable person to doubt his impartiality, submitting that "the dearth of evidentiary proof of bias, coupled with the law clerk's removal from participation following her inadvertent exposure to information regarding the case, undermines the present claim. The suspicions and speculations within the motion are wholly insufficient to overcome the presumption of impartiality."[22] Order, *Hyundai Motor Am. v. Applewhite*, No. 2015-CA-01886-SCT (Miss. Mar. 7, 2019).

¶109. Notwithstanding the procedures found in Rule 48C of the Mississippi Rules of Appellate Procedure, Canon 3 of the Code of Judicial Conduct provides that "[j]udges *should* disqualify *themselves* in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances . . . ." Miss. Code Jud. Conduct Canon 3E(1) (emphasis added). Thus, a judge should recuse when impartiality might be questioned by a reasonable person, even when proof of actual bias is lacking. Even without proof of actual bias, the recusal standard must consider appearances, in other words, "how this situation appears to the general public and the litigants . . . ." *In re Moffett*, 556 So. 2d 723,

---

[22]The majority misstated the standard of evidence required under Canon 3A. The movant need not produce evidence of actual bias. Rather, "the proper standard is that recusal is required when the evidence produces a reasonable doubt as to the judge's impartiality." *Dodson v. Singing River Hosp. Sys.*, 839 So. 2d 530, 533 (Miss. 2003).

725 (Miss. 1990) (quoting *Jenkins v. Forrest Cnty. Gen. Hosp.*, 542 So. 2d 1180, 1181 (Miss. 1989)) (fact that judge's brother was affiliated with the law firm representing the defendant was sufficient to create an objective appearance of partiality necessitating recusal). The standard is not dissimilar to the standard where "[t]he right to a fair trial is defeated and reversal is required when a party's conduct creates an 'appearance of unfairness' in court proceedings, even if proof is lacking that the party actually attempted to influence jurors." Maj. Op. ¶ 54 (quoting *Great Am. Surplus Lines Ins. Co. v. Dawson*, 468 So. 2d 87, 90 (Miss. 1985)).  Indeed, the test for the appearance of impartiality guiding recusal is an objective test.  *Moffett*, 556 So. 2d at 725.

> Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be.

*Hall v. Small Bus. Admin.*, 695 F.2d 175, 179 (5th Cir. 1983).  Law clerks occupy a unique position of trust.  Chief Justice Randolph's law clerk, whom he presumably trusted enough to work on this very case, morphed into a material witness in this case, while at that time remaining in the Court's employ.  As a witness in the case, her credibility then became an important factor.  I dare surmise that most judges trust law clerks whom they allow to remain in their employ.  Certainly, it would appear to the public and the litigants that it would be difficult for a judge to objectively weigh the testimony and credibility of a law clerk in his or her employ.  Furthermore, that employment as a law clerk suggests a high degree of trust.

¶110.  Additionally, this Court did not disclose that a law clerk was a witness for six months after the incident occurred, and then it did so in a letter that did not identify the justice for

whom the law clerk worked. Not only did this justice fail to recuse, but he has authored the majority opinion using a tone of outrage. Tellingly, the appearance of partiality standard espoused in Canon 3E(1) is strong enough that Justice Griffis felt compelled to disclose to the parties that Horne's husband, another material witness in this case, was a distant cousin of his with whom he has no close familial relationship.

¶111. In an effort to avoid questions about their participation in the case and how that participation would cause a reasonable person to question their individual lack of impartiality and the lack of impartiality in this decision, Chief Justice Randolph, Justice Griffis, and Justice Ishee on their behalf attempt to cloak themselves in Mississippi Rule of Appellate Procedure 48C, styled "Disqualification of Justices or Judges of the Appellate Courts." This rule addresses the process to be followed when a party files a recusal motion. Included in the process is that

> Motions for recusal shall be decided in the first instances by the justice or judge who is the subject of the motion. The remainder of the court on which such justice or judge serves shall, prior to the order being entered, be *informed* of a decision of a justice to deny recusal, and *such decision shall be subject to review by the entire court upon motion for reconsideration . . . .*

M.R.A.P. 48C(a)(iii) (emphasis added). The justice subject to the motion is the only justice who makes a decision in the first instance; the remainder of the Court is merely informed. The author of the majority opinion states that he notified the Court of his intent to deny the motion for recusal, and no member of the Court objected. His reliance on that is misplaced. Clearly, Rule 48C(a)(iii) requires that other members of this Court be notified of the intent to deny a motion for recusal; but until a motion for reconsideration is filed, the decision to

deny recusal is *solely* in the province of the justice whose recusal is sought. Under Rule 48C, the other justices have no decision-making power over the initial denial of a motion to recuse.

¶112. While attempting to find cover for their actions in Rule 48C, the justices completely ignore Mississippi Code of Judicial Conduct Canon 3E(1), which, as noted, provides that "[j]udges should disqualify themselves in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances . . . ." Canon 3 does not require that a motion for recusal be filed. The provisions of Canon 3E(1) make clear that this is a mandate and a duty placed upon the individual judge or justice. The responsibility of a member of this Court to honor that personal mandate to disqualify himself continues throughout the life of a case, even in situations in which a motion for recusal has been previously denied. Indeed, Justice Ishee's separate opinion speaks of a judge's duty—namely the duty to hear the cases before him or her. Yet, the separate opinion ignores the fact that disqualifying oneself in circumstances in which impartiality would be questioned is also a corresponding judicial duty. Miss. Code Jud. Conduct Canon 3E(1).

¶113. "[W]e must be forever mindful of our duty to guard jealously 'the public's confidence in the judicial process.' We must be vigilant to avoid the appearance of impropriety in any and all of our proceedings as judges." *Dodson*, 839 So. 2d at 534 (citations omitted).

¶114. I emphasize that proof of actual bias need not exist to warrant recusal, so long as the appearance of partiality is present. The standard we examine is whether a reasonable person knowing all of these facts would call into question the impartiality of this Court's decision. One of the material witnesses in this case only became a material witness while in the employ

of a justice of this Court as a law clerk occupying a position of trust with the justice, and after having worked on this very case. That employee witness's husband, who is related to another justice, became a material witness at the same time. The reason this witness and her husband could even identify the party seated next to them at a restaurant, allegedly randomly in quite a coincidental happenstance, as the braggart in question in this case was solely due to the employee's work on this case for this Court. The employee witness did not recuse on the record for six months, and all that time remained in the employ of the Court. The letter from the Court notifying the parties of the recusal did not identify the justice for whom this employee worked. And that employee continued to work for that justice for a time after her recusal from this case. The justice for whom the employee witness worked is now the author of the majority opinion in this case, an opinion that expresses strong outrage about the conduct of others tainting justice. The justice who is related to another witness, who is also the employee witness's husband, has actively participated in the decision in this case. This Court ignores the fact that this Court's opinion will almost certainly appear unfair to a reasonable person knowing all of these facts, and that reasonable person would be justified in questioning this Court's impartiality.

**KITCHENS, P.J., JOINS THIS OPINION.**

**COLEMAN, JUSTICE, DISSENTING:**

¶115. I write the instant opinion to explain why, when I wholly share the sentiments of my colleagues in the majority concerning the serious nature of attorneys, who serve as officers of the courts, misrepresenting facts to the court, I am of the opinion that the judgment for the

Plaintiffs in the above-styled case should be affirmed. I also write to address the issues raised by the defendants nearly six years ago when they filed the appeal in the instant matter, all of which go unaddressed by any of the five other opinions authored in the case *sub judice*. As many of the issues raised by Hyundai in its appeal concern evidentiary questions that could arise again on retrial, we do a disservice to the attorneys, parties, and trial judge by not addressing them today.

## PART I: JURY TAMPERING AND RECUSAL ISSUES

**I.      Whether the trial court erred in finding no extraneous information to or undue influence on the jury.**

### *A.      Applicable Standard of Review*

¶116. After holding the Rule 60(b)(6) hearing ordered by the Supreme Court, the trial judge entered an order. We can only reverse the trial court's grant or denial of a new trial for abuse of discretion. *Little v. State*, 233 So. 3d 288, 295 (¶ 32) (Miss. 2017) (holding that the Court must evaluate the weight of the evidence and the credibility of the witnesses as we undertake a determination of whether the trial court's ruling was an abuse of discretion). The trial judge found, "[t]here was no extraneous prejudicial information brought to the jury's attention nor was there any undue influence bore upon the jury." The quoted language, at the risk of stating the obvious, is a finding of fact. The order reports that the trial judge based his findings on the testimony of the jurors, whom he found to be "creditable and honest."

¶117. When "the trial judge's findings of fact are supported by substantial, credible and reasonable evidence, we must afford deference to these findings on appeal, and thus, we will not disturb the trial judge's findings of fact 'unless they are manifestly wrong, clearly

erroneous or an erroneous legal standard was applied.'" ***Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n***, 964 So. 2d 1100, 1107 (¶ 15) (Miss. 2007) (quoting ***City of Jackson v. Perry***, 764 So. 2d 373, 376 (¶ 9) (Miss. 2000)). "[T]he trial judge is in the best position to determine whether the jury as selected was fair and impartial, and thus its ruling should not be disturbed on appeal unless that decision is clearly in error." ***Caston v. State***, 823 So. 2d 473, 498 (¶ 84) (Miss. 2002) (citing ***Fleming v. State***, 687 So. 2d 146, 148 (Miss. 1997), *overruled on other grounds by* ***Roberts Co., Inc. v. Moore***, 214 So. 3d 202, 207 (¶ 19) (Miss. 2017)).

### B. Analysis

¶118. To obtain a new trial, Hyundai was required to demonstrate a reasonable possibility that outside contact with a juror or jurors altered the verdict. ***Gladney v. Clarksdale Beverage Co., Inc.***, 625 So. 2d 407, 419 (Miss. 1993). Mississippi law required Hyundai to "make an adequate showing to overcome the presumption [in Mississippi] of jury impartiality." ***Id.*** at 418. Accordingly, the trial court's factual finding that no extraneous, prejudicial information was brought to the jury decides the matter, unless the finding was manifestly wrong or clearly erroneous.

¶119. I need not repeat the in-depth recitation of the evidence found in both the majority opinion and Presiding Justice Kitchens's dissent. The evidence of improper conduct by plaintiff's counsel is striking and unsettling. To a great extent I agree with the strong reactions of several of my colleagues. I am constrained, however, by the standard of review applicable to the trial judge's findings of fact. The trial judge was in a much better position

to judge the credibility of the jurors who testified at the hearing. *See, e.g.*, ***Brown v. State***, 890 So. 2d 901, 910 (¶ 20) (pointing out that the trial judge is in the best position to judge the credibility of a potential juror during voir dire). Moreover, as set forth above, we have established a standard for granting a new trial for improper contacts with members of a jury, and that standard requires proof adequate to overcome the presumption of jury impartiality.

¶120. The majority fails to address the presumption or explain how it can be overcome without direct evidence of improper contact with jurors who delivered the underlying verdict. The remarks overheard by Allison and Hunter Horne do not amount to evidence that Sparks had improper contact with any juror during the trial. Spark's comments relayed by the Hornes could relate to impressions gained after the trial, or from conversations he had with attorneys regarding their impressions, or from a myriad of sources. He could have made them with a number of different motivations. We simply cannot know, and they fall short of showing the trial judge's finding of fact to be manifest error or clearly erroneous.

¶121. The most damning evidence identified by the majority is the comment, made by Sparks to attorney Mary Margaret Gay and conveyed by Gay in her testimony, that Sparks "spent two days trying to teach [a juror] how to count, and that just never worked out." Maj. Op. ¶ 7. As disturbing as I find the evidence adduced during remand to be, I simply cannot reach the conclusion that Gay's testimony, never vetted by a finder of fact able to observe the witness suffices to overcome the two-fold obstacles of the standard of review of the trial judge's finding of fact and the presumption of jury impartiality.

¶122. Furthermore, the majority treats the testimony of the Hornes and Gay as admissible

evidence without addressing Plaintiffs' contention that they constitute inadmissible hearsay. Certainly, Sparks's statements reported by the Hornes and Gay were not made during any legal proceeding and are being offered by Hyundai to prove the truth of the matter asserted. Miss. R. Evid. 801(c)(2). The majority, though, ignores Plaintiffs' objection to its reliance upon the statements. We have set the Supreme Court up as the original finder of fact as to all of the evidence submitted except as to the juror testimony at the Mississippi Rule of Evidence 606(b) hearing conducted by the trial judge. If we are going to so choose, we should confine our review to admissible evidence and address the Plaintiffs' objections.

¶123. With respect, "a taint of unfairness, real and perceived," Maj. Op. ¶ 55, is not the correct legal standard for overcoming the presumption of jury impartiality under established Mississippi law. The language upon which the majority in part relies, "taint of unfairness, real or perceived," comes from *Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264, 1279 (¶ 53) (Miss. 1999). However, the *Hunter* Court wrote that the allegations of improper juror knowledge that gave rise to the taint of unfairness, real or perceived in *Hunter likely did not* constitute reversible error. *Id.* at 1278 (¶ 54). It was only in combination with other errors that were held to have occurred by the *Hunter* Court that the jury verdict there was reversed. *Id.* at 1279 (¶ 55). As further discussed below, the majority makes no mention of any other assignments of error raised by Hyundai in the instant appeal. I also agree with the points made by Presiding Justice Kitchens in distinguishing cases upon which the majority relies in which actual contact with jurors was proved. Accordingly, I cannot concur.

II.     The Recusal Issue

¶124. On the recusal issue, I join my colleagues who would hold that the recusal of Chief Justice Randolph and Justice Griffis was not warranted.

## PART II: OTHER ISSUES RAISED BY HYUNDAI ON APPEAL

¶125. Forgotten in the brouhaha over the jury-tampering and recusal issues is the fact that the above-styled appeal began when Hyundai appealed a jury verdict in favor of the Plaintiffs. Before the court remanded the jury-tampering issue to the trial court for discovery and a hearing, Hyundai raised several issues seeking reversal of the verdict. Whether the holding today is to affirm or reverse based on jury tampering, the issues originally raised by Hyundai and its attorneys almost six years ago should be addressed. Because consideration of the issues raised by Hyundai in its principal brief require a broader recitation of the facts and history of the case, I provide them below.

## FACTS AND PROCEDURAL BACKGROUND

¶126. On the morning of July 9, 1995, Dorothy Mae Applewhite, Anthony Stewart, and Cecilia Cooper were occupants in a Hyundai Excel, traveling home from working night shifts at a casino in Tunica, Mississippi. The Excel was being driven southbound on U.S. Highway 61. The Excel crossed the center line of the two-lane highway and collided with a Lincoln Continental traveling north. As a result of the collision, the Excel was torn apart. The front of the Excel rested more than fifty feet north of the point of impact, while the rear portion rested about five feet from the point of impact. All three occupants of the Excel were ejected or partially ejected and died at the scene. All three occupants of the Lincoln sustained non-life-threatening injuries.

¶127. In 1998, the estates of the Excel's occupants (collectively, "Plaintiffs") filed a wrongful-death lawsuit against Hyundai, the Excel's manufacturer, alleging that it was defective, rendering it not crashworthy. In a crashworthiness case, the plaintiff must prove that the vehicle's alleged defect enhanced the plaintiff's injuries beyond those that the plaintiff otherwise would have suffered in the accident. *Toliver v. Gen. Motors Corp.*, 482 So. 2d 213, 214 (Miss. 1985); *Estate of Hunter*, 729 So. 2d at 1272 (¶¶ 27-28). Plaintiffs here alleged that the enhanced injuries were the Excel's occupants' deaths and that if the vehicle had remained intact, the occupants would have not been ejected and thus would have survived.

¶128. Following the first trial in 2008, the jury found that the Excel was defectively designed and manufactured and awarded $4.5 million to Plaintiffs ($1.5 million to each Plaintiff). *Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 751 (¶ 1) (Miss. 2011) ("*Applewhite I*"). Hyundai appealed, and the Court reversed and remanded for a new trial because Plaintiffs failed to seasonably amend their responses to Hyundai's requests for discovery. *Id.* Following the second trial in September 2014, the jury found the Excel was defectively designed[23] and awarded $10.5 million to Plaintiffs ($3.5 million to each Plaintiff).

¶129. Hyundai appealed, raising several assignments of error. Hyundai argues that it is entitled to judgment as a matter of law because (1) there was no legally sufficient evidence to support Plaintiffs' newly hatched argument—essential to Plaintiffs' case—that the Excel was traveling only eighteen miles per hour at impact; (2) Plaintiffs failed to offer admissible expert testimony—essential to Plaintiffs' case—that the Excel was defectively designed; and

---

[23] The manufacturing-defect claim did not go to the jury in the second trial.

71

(3) Plaintiffs improperly circumvented the Court's mandate in *Applewhite I* and evaded judgment by replacing, rather than disclosing, faulty expert opinions.

¶130. Alternatively, Hyundai argues that it is entitled to a new trial because (4) the trial court erred in excluding evidence that the Excel's occupants were not properly seat-belted; (5) the trial court erred in excluding photographic evidence showing that numerous other vehicles have split apart in similar crashes; (6) Hyundai was denied a fair trial by an impartial jury due to an unlawful venire procedure and through improper influence on a member of Plaintiffs' trial team; and (7) the verdict was the product of prejudice or passion because it failed to apportion any fault to the driver of the Hyundai, whose negligent driving indisputably caused the crash.

¶131. Throughout the case, Plaintiffs' theory of liability has been that the Excel was defectively designed and that had it not been torn apart, the Excel's occupants more likely than not would have survived the crash. Hyundai's defense has been that the Excel was not torn apart due to a design defect but rather by the tremendous forces that were far and above what the Excel could have been expected to withstand. Hyundai has maintained that the tremendous forces that the Excel endured were too great for the occupants to have survived.

¶132. A critical measure in determining whether a crash is survivable is the change in velocity or delta-v generated from a collision. Therefore, a central dispute between the parties has been the determination of the delta-v that the occupants of the Excel would have experienced had it remained intact. Because the impact speeds of the vehicles are used in calculating the delta-v, the Excel's speed at impact has been hotly disputed throughout the

72

case.

¶133. During the first trial, Plaintiffs' expert accident reconstructionist, Andrew Webb, opined that the Excel was traveling thirty-five miles per hour at impact; however, Hyundai's expert accident reconstructionist, Dr. Geoff Germane, opined that the Excel was traveling at least forty-five miles per hour at impact. Dr. Germane and Webb agreed that the Lincoln was traveling fifty-five miles per hour at impact. Webb also opined that, had the Excel remained intact, the occupants would have experienced a delta-v of thirty-five miles per hour. *Applewhite I*, 53 So. 3d at 752 (¶ 5). Dr. Germane opined that, had the Excel remained intact, the occupants would have experienced a delta-v ranging from fifty-five to sixty-seven miles per hour. *Id.* at 752 (¶ 6).

¶134. Plaintiffs' expert forensic pathologist specializing in biomechanics, Dr. Joseph L. Burton, testified that, more likely than not, the occupants would have survived the crash with a delta-v of thirty-five miles per hour. *Id.* at 752 (¶ 5). Dr. Burton conceded that a crash is not survivable with a delta-v in excess of fifty miles per hour. *Id.* at 752 (¶ 6).

¶135. Plaintiffs' expert design engineer, James D. Mundo, testified that the Excel was defectively designed and defectively manufactured, and the defects caused it to come apart during the crash. *Id.* at 752 (¶ 5). Mundo also offered an alternative design of the A-pillar, a beam that connects the roof of the vehicle to its body on either side of the windshield, which would have made the vehicle significantly stronger and would not have been cost prohibitive. *Id.* at 756 (¶ 22).

73

¶136. On appeal, Hyundai argued that the expert opinions of Mundo, Dr. Burton, and Webb were unreliable under Mississippi Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Applewhite I*, 53 So. 3d at 752-53 (¶¶ 8, 12). Alternatively, Hyundai argued that Plaintiffs had failed to disclose pretrial changes to Webb's opinion. *Id.* at 752, 755 (¶¶ 8, 13). The Court held that the trial court did not abuse its discretion by finding Mundo's testimony sufficiently reliable. *Id.* at 755-757 (¶¶ 21, 29). The Court also held that the trial court did not abuse its discretion by refusing to strike the testimony of Dr. Burton and Webb because Hyundai failed to make contemporaneous objections to their opinions. *Id.* at 755 (¶¶ 17-20).

¶137. However, the Court reversed and remanded for a new trial on the alternative ground that it does not condone trial by ambush. *Id.* at 759 (¶ 36). The Court held that the trial court abused its discretion by refusing to grant Hyundai relief due to Plaintiffs' failure to comply with Mississippi Rule of Civil Procedure 26(f) by not seasonably amending their responses to Hyundai's requests for discovery regarding Webb's opinions. *Id.* at 751, 759 (¶¶ 1, 36). As to allegedly unreliable expert testimony, the Court stated:

> Hyundai is not entitled to a judgment rendered in its favor on appeal based on the trial judge's allowing the [P]laintiffs' expert testimony (which Hyundai asserts was unreliable) to be adduced before the jury. This issue can be revisited on remand, in the event [Hyundai] interposes timely and appropriate objections.[24]

---

[24] Because the Court reversed and remanded based solely on Plaintiffs' discovery violation, the Court did not address the remaining issues raised by Hyundai, which included whether the jury's allocation of 100 percent fault to Hyundai demonstrated the jury's passion and prejudice in reaching its verdict, and whether seat belt evidence was wrongly excluded. *Applewhite I*, 53 So. 3d at 752 (¶ 8).

*Id.* at 759 (¶ 37).

## Postremand Proceedings

¶138. Following remand, on May 29, 2012, Plaintiffs designated a new expert accident reconstructionist, Micky Gilbert. On June 5, 2012, Plaintiffs filed a notice formally withdrawing Webb as an expert and substituting Gilbert in his stead. The parties proceeded with additional discovery, and on September 15, 2014, the second trial began.

¶139. Gilbert's opinion differed from Webb's opinion as to the speed of the Excel at impact. Gilbert opined that the Excel was traveling between 17.5 and 20.8 miles per hour at impact, whereas Webb had opined that the Excel was traveling thirty-five miles per hour at impact. Although Gilbert determined the Excel was traveling approximately eighteen miles per hour at impact, he reached essentially the same delta-v calculation as his predecessor, Webb. Based on the Excel's eighteen-mile-per-hour impact speed and the Lincoln's fifty-mile-per-hour impact speed, Gilbert concluded that the Excel's occupants would have experienced a delta-v of thirty-four to thirty-seven miles per hour had it remained intact. Dr. Burton opined that, had the Excel remained intact, the Excel's occupants more likely than not would have survived.

¶140. Plaintiffs' expert design engineer, Mundo, opined that the Excel's safety cage structural design was defective and unreasonably dangerous as demonstrated by the Excel breaking into three pieces in a foreseeable crash at less than highway speeds. Mundo explained that the safety cage structural design was "discontinuous" and failed to act as a unified system to provide a reasonable level of protection for the occupants. Mundo also

opined that the "spot welds" aggravated the defects in the safety cage structural design, which reduced the strength and crash energy absorption.

¶141. Mundo opined that by utilizing joint strengths throughout the safety cage, the overall strength of the joints in the whole cage would increase by 880 percent. Mundo testified that the alternative design was technologically feasible in 1993 and could have been incorporated without impairing the utility, usefulness, practicality, or desirability of the Excel. Mundo opined that utilizing the alternative design would have prevented the safety cage from breaking into three pieces and would have provided a reasonable level of protection for the occupants.

¶142. During Hyundai's case-in-chief, it called to the stand Kenny Runions and Roland Jordan, who were eyewitnesses to the crash. Runions, a truck driver, testified that he was driving southbound at fifty-five miles per hour immediately behind the Excel. Runions observed the Excel drift off onto the right shoulder, jerk back onto the highway, cross the center line into the northbound lane, and jerk back into the southbound lane. Runions testified that the Excel again drifted off onto the right shoulder, jerked back into the southbound lane, crossed over the center line, and collided into the oncoming Lincoln in the northbound lane. Runions testified that the Excel's brake lights never came on.

¶143. Runions also testified for the first time that the Excel's speed was fifty-five miles per hour *at impact*. At the time of the accident, Runions provided a statement to a Mississippi state trooper, who wrote that Runions stated the Excel "was traveling about [fifty] miles per

hour." The statement did not provide the Excel's speed at impact.[25] Runions testified that the speed was incorrectly recorded on the statement because he had told the trooper that the Excel was traveling fifty-five miles per hour.

¶144. Jordan was driving southbound immediately in front of the Excel before the crash. Jordan testified that he observed through his rear-view mirror the Excel going on and off the road. Jordan testified that he was traveling between forty-five and sixty-five miles per hour just before the crash and that the Excel was keeping pace with him. Jordan testified that the Excel was out of control and struck the oncoming Lincoln in the northbound lane. Jordan suggested that the Excel "accelerated" just before impact.

¶145. On direct, Jordan initially guessed the speed of the Excel at impact but ultimately testified that the Excel was traveling between fifty and fifty-five miles per hour at impact. On cross-examination, Jordan testified that he had provided a statement to Hyundai investigators in 1999. Jordan acknowledged that his 1999 statement provided that he "couldn't even begin to speculate" as to the Excel's speed at impact and further that he had "no knowledge or basis to know what speed" the Excel was going. On redirect, Jordan was asked, "[h]ow fast was [the Excel] going when it hit the Lincoln?" Jordan answered, "Between 50 and 55 miles an hour, I guess." Jordan then confirmed his answer was fifty to fifty-five miles per hour.

---

[25] Runions's statement, which was attached to the police report, provided: "White car S/B on 61 was traveling about 50 mph. White car run [sic] off road and then swerved back over to bring back on road as driver was attempting to bring vehicle back on road the white vehicle began to fishtail and driver steered back to the right vehicle began to fishtail again then vehicle ran back into the gravel again. After running off the road for the 2nd time white car steered to the left and crossed into the N/B lane hitting the blue Lincoln[.]"

¶146. Hyundai's reconstructionist, Dr. Germane, opined that the Excel was traveling 42.5 miles per hour (based on a range of forty to forty-five miles per hour) at impact, and the Lincoln was traveling between fifty and fifty-five miles per hour at impact. Dr. Germane opined that using the impact speeds would have generated a delta-v exceeding fifty miles per hour. As in the first trial, the parties agreed that a delta-v of more than fifty miles per hour was not survivable.

¶147. At the conclusion of the second trial on September 26, 2014, the jury returned a verdict of $10.5 million in favor of Plaintiffs. The jury apportioned 100 percent fault to Hyundai and no fault to the driver of the Hyundai, Applewhite.

**The Posttrial Proceedings**

¶148. On January 21, 2015, Hyundai filed a motion seeking a judgment as a matter of law (JNOV) or, in the alternative, a new trial based on several grounds. In particular, Hyundai raised, for the first time, an issue regarding the integrity of the jury. Hyundai argued that the jury was selected through an informal venire process in which the circuit clerk excused jurors for hardship based on unsworn, out-of-court explanations in violation of statutory requirements that the trial court hear and decide hardship excuses. On April 23, 2015, Hyundai filed a supplemental motion for a new trial or, alternatively, for relief from the judgment under Mississippi Rule of Civil Procedure 60(b), for a posttrial hearing to investigate possible outside influences on the jury, and for other relief. In the supplemental motion, Hyundai explained that it had received information that a preacher, Bishop Carey Sparks, who allegedly was affiliated with Plaintiffs' trial team, possibly had improper contact

with a juror.

¶149. A hearing on the issues involving the integrity of the jury was held on April 20, 2015. On December 9, 2015, the trial court entered an order denying Hyundai's posttrial motions in their entirety. The trial court also declined to grant Hyundai's request for additional discovery or to conduct an investigation into Sparks's possible influence on the jury.

## DISCUSSION

### I. Whether legally sufficient evidence supports Plaintiffs' theory that the Hyundai Excel was traveling eighteen miles per hour at impact.

¶150. Hyundai argues that no legally sufficient evidence supports Plaintiffs' newly hatched argument that the Excel was traveling only eighteen miles per hour at impact. In *Applewhite I*, the Court noted, that although Hyundai presented the issue as a "sufficiency-of-the-evidence-argument, it [was], in fact, attacking the admissibility of the expert testimony." *Applewhite I*, 53 So. 3d at 753 (¶ 12). The same holds true here. If the trial court did not err by allowing Gilbert, Plaintiffs' accident-reconstruction expert to testify, then the jury heard admissible evidence that the Excel traveled at eighteen miles per hour at impact. It then becomes the jury's duty to discern which testimony is true. *See Pat Harrison Waterway Dist. v. Cnty. of Lamar*, 185 So. 3d 935, 948 (¶ 58) (Miss. 2015) ("And while it is true that differing opinions were submitted to the chancellor, the credibility and evidentiary value of expert opinions is a matter left squarely with the fact-finder.")

¶151. Indeed, Hyundai argues that Gilbert's opinion is counterfactual, utterly unreliable, and should have been excluded. Hyundai argues that Gilbert's opinion is inadmissible under *Daubert* because, first, it was transparently reverse-engineered to justify Plaintiffs'

79

predetermined conclusion and contradicted two eyewitnesses who testified that the Excel was traveling fifty to fifty-five miles per hour at impact; second, Gilbert admitted that he had not tested his eighteen-miles-per-hour theory, which was belied by actual crash testing; and, third, Gilbert never assessed the total energy involved in the crash. Alternatively, Hyundai argues that, even if Gilbert's opinions are admissible, they are totally overwhelmed by the weight of the evidence, namely, testimony of two eyewitnesses and crash test results.

¶152. The standard of review for the admission or exclusion of expert testimony is abuse of discretion. *Patterson v. Tibbs*, 60 So. 3d 742, 748 (¶ 19) (Miss. 2011).

> "Our inquiry is limited to whether the trial judge abused his discretion; we may not rule on whether he was 'right' or 'wrong' in our view. And, unless the trial court based its decision on an erroneous review of law, . . . this Court is not authorized to reverse for an abuse of discretion unless we find it was 'arbitrary and clearly erroneous.'"

*Adams v. Graceland Care Ctr. of Oxford, LLC*, 208 So. 3d 575, 580 (¶ 13) (Miss. 2017) (alteration in original) (quoting *Detroit Marine Eng'g v. McRee*, 510 So. 2d 462, 467 (Miss. 1987)). "The reviewing court should not reverse a discretionary finding by the lower court unless it comes to a 'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors.'" *Nunnery v. Nunnery*, 195 So. 3d 747, 752 (¶ 13) (Miss. 2016) (quoting *Plaxico v. Michael*, 735 So. 2d 1036, 1039 (¶ 11) (Miss. 1999)).

¶153. Experts should be given wide latitude when offering opinions within their expertise. *Patterson*, 60 So. 3d at 748 (¶ 21) (citing *Daubert*, 509 U.S. at 592). Rule 702 of the Mississippi Rules of Evidence, which governs the admissibility of expert opinions, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

MRE 702.

¶154. The *Daubert* Court adopted a list of nonexclusive factors that trial courts may consider in determining whether expert testimony is reliable: "(1) whether the expert's theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; and (4) the general acceptance that the theory has garnered in the relevant expert community." *Patterson*, 60 So. 3d at 748-49 (¶ 21) (citing *Daubert*, 509 U.S. at 593-94). The application of the factors depends on the nature of the issue, the expert's expertise, and the subject of the testimony offered by the expert. *Id.* at 749. In other words, the inquiry is "a flexible one." *Daubert*, 509 U.S. at 594. The *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotation mark omitted).

¶155. When determining whether expert testimony is admissible, trial courts should act as

gatekeepers and must determine whether the proposed testimony meets the requirements of Rule 702 and *Daubert*'s relevance and reliability prongs. *Patterson*, 60 So. 3d at 749 (¶ 22). It is not the job of the trial court to determine the reliability of the expert's opinions; rather, the trial court's bailiwick includes the relevance and reliability of the principles that underlie the opinions. *Daubert*, 509 U.S. at 594-95. "Regarding the 'reliability' prong—which is at issue in the present case—the testimony must be grounded in the methods and procedures of science, not merely a subjective belief or unsupported speculation." *Worthy v. McNair*, 37 So. 3d 609, 615 (¶ 16) (Miss. 2010) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 36 (¶ 11) (Miss. 2006)).

¶156. "As part of the trial court's gatekeeping role, it must 'examine the reliability' of the expert's opinion and must determine whether the facts 'afford a "reasonably accurate basis" for the expert's conclusion.'" *Patterson*, 60 So. 3d at 752 (¶¶ 35-36) (quoting *Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 60 (Miss. 2004); *see also APAC-Miss., Inc. v. Goodman*, 803 So. 2d 1177, 1185 (¶ 30) (Miss. 2002). The sufficiency of foundational facts or evidence on which an expert bases his or her opinion is a question of law. *Patterson*, 60 So. 3d at 752 (¶ 36).

¶157. Hyundai presents several arguments supporting its contention that the trial court erred in allowing Gilbert to present his opinions to the jury. Its arguments are not without their allure. For the reasons set forth below, however, I do not reach a definite and firm conviction that the trial judge committed a clear error of judgment.

**A.** **Gilbert's opinions were not inadmissible even though they conflicted with eyewitness testimony.**

¶158. Hyundai claims that for Plaintiffs to achieve a potentially survivable thirty-five-mile-per-hour delta-v benchmark and yet make the math work, Plaintiffs' new reconstructionist, Gilbert, reverse-engineered an opinion that the Excel had slowed to eighteen miles per hour before impact. Hyundai contends that Gilbert's opinion is unreliable because it was a result of transparent reverse engineering to meet a predetermined thirty-five-mile-per-hour delta-v, which was the linchpin of Plaintiffs' liability theory. In other words, Hyundai contends Gilbert began with the desired delta-v and from there calculated the necessary speed at impact, rather than beginning with an acceptable factual basis and calculating the impact speed from that.

¶159. While Gilbert arrived at the nearly identical delta-v conclusion as Webb, Plaintiffs argue that Gilbert started from scratch in performing his own reconstruction and used different calculations and methodology than Webb. Plaintiffs also argue that experts interpret data differently, and the differences should not be used as a basis to exclude the testimony as long as the opinion is reliable and relevant.

¶160. Gilbert produced an expert report that is in the record. He inspected the Excel, the Lincoln, and the scene of the crash. Gilbert reviewed and analyzed the police report, photos of the scene, and witness statements. Gilbert determined the Excel's yaw sequence from tire marks left by the Excel were represented by police paint markings. Gilbert pointed out that distinct marks on the corner of the Excel's tires' treads also indicated that the Excel went back and forth several times. Based on the yaw marks, tire treads, and witness statements, Gilbert determined that the Excel engaged in a three-steer sequence over the course of 250 feet before

83

impact. Gilbert testified that the 250-foot figure was used "to be on the conservative side[,]" although the distance of the three steer sequence could have been up to 400 feet.

¶161. Gilbert explained how he arrived at the Excel's impact speed of eighteen miles per hour. Based on Runion's statement attached to the police report and Jordan's prior testimony that the Excel was traveling between forty-five and fifty miles per hour, Gilbert determined that the initial speed, or fixed point, of the Excel before it began the three-steer sequence or yawing was 42.5 to forty-eight miles per hour. Gilbert explained that when a vehicle yaws or fishtails, it decelerates. Starting with the fixed point, Gilbert calculated the deceleration rate during the yaw sequence. Gilbert testified that he used "linear momentum analysis on the actual collision itself to kind of confirm that speed." Gilbert opined that the Excel slowed down during a three-steer sequence that occurred over the distance of 250 feet from the initial speed to eighteen miles per hour.

¶162. As evidence for its theory that Gilbert reverse-engineered his opinions to reach a desired conclusion, Hyundai cites the eyewitness testimony of two witnesses, Runions and Jordan, but Gilbert did not ignore or reject their testimony. Moreover, their testimony was not as certain as Hyundai would like, and it should be remembered that testimony regarding the speed of another vehicle is itself opinion testimony, albeit lay rather than expert. *See United States v. Sowards*, 690 F.3d 583, 604 n.6 (4th Cir. 2012) (Traxler, C.J., dissenting) ("Traditional examples of permissible lay opinions include the speed at which a vehicle was traveling." (internal quotation marks omitted) (quoting *State v. McLean*, 205 N.J. 438, 16 A.3d 332, 343 (2011))).

¶163. Runion's prior statement and Jordan's prior testimony upon which Gilbert relied to determine the initial speed of the Excel did not provide the Excel's speed *at impact*. Runions and Jordan first testified that the Hyundai was traveling forty-five to fifty miles per hour *at impact* for the first time during Hyundai's case-in-chief in the second trial, which was *after* Gilbert gave his opinion.[26] During cross-examination, Runions testified that the first time he told anyone that the Excel was traveling fifty-five miles per hour at impact was on the day of his testimony during the second trial, nineteen years after the accident. Runions also admitted that nowhere in his official statement to the police, given at the time of the collision, did he report the Excel was traveling fifty-five miles per hour.

¶164. When cross-examined by Plaintiffs' attorney, Jordan testified that he met with investigators for Hyundai in 1999 and provided a statement. Counsel for Plaintiffs read from the statement during the cross-examination. In the statement, Jordan maintained that he "couldn't even begin to speculate" the Excel's speed. Jordan admitted on cross-examination that the only known speed that he could provide with certainty was that, before the collision, he was traveling forty to fifty-five miles per hour. When Jordan was specifically asked not to *guess* the Excel's speed at impact, Jordan testified, "Okay. I was doing about sixty, sixty-five, I'd say probably about fifty-five miles an hour. Fifty, fifty-five miles an hour, I guess." The trial court sustained Plaintiffs' counsel's objection as to speculation, and then Jordan testified, "All right. Fifty-five miles an hour."

---

[26]Before to trial, Hyundai filed a motion in limine to exclude Gilbert's opinions, arguing that they were unreliable. References to eyewitness accounts of the accident are not included among Hyundai's grounds for excluding Gilbert's opinion.

¶165. Moreover, Hyundai's own reconstructionist, Dr. Germane, testified that he did not use Runions's nor Jordan's prior statements or testimony in his calculations. Rather, Dr. Germane testified that he used "physical evidence" and then "applied known principles of physics to that evidence." As described above, the eyewitness testimony upon which Hyundai relies so heavily to argue that Gilbert's impact speed must be unreliable was undermined. The jury determines the weight and credibility of witnesses. *Solanki v. Ervin*, 21 So. 3d 552, 568 (¶ 41) (Miss. 2009). Here, the jury had the right to evaluate and determine what portions of their testimony of any witness it would accept or reject. *Mine Safety Appliance Co. v. Holmes*, 171 So. 3d 442, 456 (¶ 56) (Miss. 2015).

¶166. Hyundai cites *APAC-Mississippi, Inc. v. Goodman*, 803 So. 2d 1177 (Miss. 2002), for the proposition that, because Gilbert's opinions contradicted the eyewitness testimony of Runion and Jordan, it must be unreliable and inadmissible. In *Goodman*, the plaintiff's loss-of-income expert based his opinions on information gained from the plaintiff's attorney. *Id.* at 1185 (¶ 31). The attorney admitted that he estimated the income, and the income was "conclusively" demonstrated on the plaintiff's W-2 forms for the year in question. *Id.* As shown above, the eyewitness testimony regarding the Excel's speed did not reach the conclusive state of the W-2 forms from *Goodman*. Therefore, *Goodman* is inapposite and does not lead to the conclusion that the trial court in the case *sub judice* abused his discretion by allowing Gilbert to testify.

¶167. Hyundai's argument that Gilbert's opinions were unreliable to the point that they should have been excluded because they contradict the testimony of Runions and Jordan has

no merit.  I would hold that the trial judge did not abuse his discretion by refusing to exclude Gilbert's testimony due to its conflict with the above-described testimony.

**B.**    **In light of the evidence of record, the trial court did not abuse its discretion by allowing Gilbert to testify despite his not testing his result.**

¶168.  Hyundai claims that Gilbert's opinion was unreliable because his theory of the Excel slowing down to eighteen miles per hour before impact could not be tested or verified. Plaintiffs argue that Hyundai misconstrued Gilbert's testimony regarding whether the accident could be replicated with a physical crash test.

¶169.  Specifically, Gilbert was asked: "[I]n terms of *this accident* which occurred on Highway 61, in your opinion, can *this accident* be replicated; that is, replicated between a Lincoln and a Hyundai and getting everything right so that it's an identical replica of what occurred?"  Gilbert answered:

> Without even -- without even having the test results or talking about them, no way.  There's no way you can do that.  I've tried to in accidents where it's been just a handling where you are trying to follow steers.  It's difficult to just get your steers right.  There are so many variables from a test track to a real-life situation.  You cannot possibly account for all of that.  Even me as a driver -- and sometimes we've used a machine -- we can't get it perfect just with handling.  Now, this is levels beyond that.  This goes into vehicles interacting with each other.  Two -- two motions of vehicles interacting with each other. You cannot possibly even attempt to replicate this type of accident with a crash test.

¶170.  The subject of the question was whether the underlying accident could be replicated in a physical crash test, not whether Gilbert's accident reconstruction *theory* could be tested and verified.  Gilbert testified that he used methodology generally accepted in the field in making his calculations and determinations as to the speed leading up to impact.  When

87

Gilbert explained how he arrived at the Excel's impact speed, he assured that he had done "thousand[s] and thousand[s] of test runs on different vehicles of all kinds[,] and consistently that's how we kind of develop our information on how a vehicle slows down is from all those tests." Even though Dr. Germane acknowledged that the crash tests were not intended to replicate the subject crash, on cross-examination, Gilbert was pressed and was faulted for not conducting his own physical crash test:

Q: Do you have a crash test to show us, Mr. Gilbert, where at the same speeds, the same angles, the same vehicles, the same weights, the same energy, the same impact that the Hyundai gets blown up like the accident Hyundai did? Do you have that to show so I could go over and show it to the jury? Do you have that, sir?

A: Like I've said three or four times already and I'm sure I'm going to have to say it many times again -- you cannot possibly replicate this. You can't do it. I've said it in my depo. You cannot do it. And I told you in my depo if I – you forced me to do it. If you were going to do this test right, the least you could do is have the arc of the two vehicles the same. Don't pull it down a straight track. I mean, it just doesn't tell you anything. It's a collision, sure. But that doesn't help anybody decide anything. No. I don't have a test because I didn't do one, because you can't.

Q: So, the translation of that, Mr. Gilbert, is you have a theory but you can't test your theory; correct?

A: That's not true. No. My theory is through known quantities, a reconstruction method. That's not true. You don't go out and run something completely different. Like I told you, it's difficult to replicate a simple steer maneuver, let alone a complicated crash test like this.

Gilbert maintained that his *theory* and reconstruction method can be and have been tested because he used known quantities for his reconstruction method.

¶171. Hyundai also argues that its expert, Dr. Germane, conducted three separate live crash

tests, one for each expert's impact-speed theories (Gilbert's, Webb's, and his own). Hyundai contends that the crash tests disprove Gilbert's theory because the test Excel did not tear apart in the crash test when using his impact speeds. But Plaintiffs aptly point out that Hyundai did not offer a crash test replicating its theory of the case due to the limitations of the testing facility. None of the crash tests conducted by Dr. Germane resulted in the Excel tearing apart as it had in the crash.

¶172. Gilbert's testimony undermined Dr. Germane's physical crash test purporting to replicate Gilbert's reconstruction theory. Gilbert offered several criticisms: the vehicles moving in a straight line as opposed to curving into one another; the tires not moving; the orientation of the vehicles; the lack of a roll angle; the use of a soap, water, and grease combination; and the direction that the speeds of the vehicles were going.

¶173. To the extent that Hyundai argues that Gilbert's opinions were inadmissible pursuant to ***Daubert*** and its progeny because he did not test his final opinion regarding speed and delta-v, I cannot conclude that the trial judge abused his discretion by allowing Gilbert to testify. As set forth above, he testified that his methodology and calculations were informed by thousands and thousands of test runs. Hyundai's attorneys were able to cross-examine him at length on the topic of testing his opinions, and the jury had the opportunity to weigh his credibility accordingly.

¶174. Conflicting expert testimony—often called a "battle of the experts"—requires the fact-finder to assign credibility; and the fact-finder in the instant case was free to accept or reject any of the expert opinions. ***Estate ex rel. Campbell v. Calhoun Health Servs.***, 66 So.

3d 129, 135 (¶ 27) (Miss. 2011).  The jury appropriately assessed Gilbert's credibility and was free to accept or reject any of his opinions.

## C.    Total Energy

¶175.  Hyundai takes issue with Gilbert's failure to calculate the "total energy," which Hyundai claims is a necessary component of any reliable accident reconstruction.  Hyundai's reconstructionist, Dr. Germane, testified that experts seeking to explain automobile collisions use a "total energy" calculation to determine the speeds necessary to cause the amount of damage evident in the vehicle involved.  Hyundai claims "the reason total-energy calculations are so important is that an expert cannot make any meaningful assessment of a vehicle's design simply by reviewing the damage that results from a collision; he must first understand the violence of that collision."

¶176.  Mundo, Plaintiffs' design-engineer expert, testified that "crashworthiness has to do with energy, number one, the energy in the crash; and number two, managing the energies in the crash and try to make vehicles reasonably safe[.]"  Mundo testified that as far as he knew, Gilbert had not calculated the total energy of the crash.  On cross-examination, Gilbert was asked why he did not perform the total-energy calculation.  The following exchange ensued:

> A:    I did.  I mean, we've already talked about I absorbed -- I took into account the energy absorbed during the yaw. The only thing, I guess, we didn't talk about was I also used energy for the roll out after impact. We've been kind of focused on kind of the impact and the energy absorbed and the impact collision forces, the momentum analysis there. But I used energy in both ends of this.

> Q:    But I didn't see it on any of those slides.

> A:    Yeah. We talked about it in my depo, and I gave all my exhibits.

Q: Well, actually, I asked you if you had done total energy calculations, and you said you didn't in your deposition.

A: Well, I'd be -- point to me to the section.

Q: I tell you what, I'll do that. Give me one second here.

Hyundai's counsel then asked about Gilbert's compensation and never revisited the total-energy subject and excused Gilbert.

¶177. Mundo testified that energy is calculated by mass and velocity, the speed of the vehicles, as well as other variables. Mundo also testified that he did have sufficient information to calculate the total energy and to determine whether the Excel should have been able to manage that energy. Hyundai's argument is without merit because Mundo testified that he had sufficient information for calculating the total energy.

**D. Whether Gilbert's opinions are totally overwhelmed by the weight of the evidence, namely consistent testimony by two eyewitnesses and crash-test results**.

¶178. Although Hyundai states the issue is that Gilbert's opinions are overwhelmed by the weight of the evidence, Hyundai actually argues that the trial court erred in denying its motion for JNOV, which is a challenge to the *legal sufficiency of the evidence*.[27] ***U.S. Fid. & Guar. Co. of Miss. v. Martin***, 998 So. 2d 956, 964 (¶ 19) (Miss. 2008). The standard of review for the denial of a JNOV is de novo review. ***Id.*** A motion for JNOV is a challenge to the legal sufficiency of the evidence, and the Court will affirm the denial of JNOV if there is

_____

[27] A motion for JNOV is a challenge to the legal sufficiency of the evidence. ***Kirk v. State***, 160 So. 3d 685, 695 (¶ 24) (Miss. 2015). Conversely, a motion for a new trial simply challenges the weight of the evidence. ***Id.***

substantial evidence to support the verdict. *Id.* "'Substantial evidence' has been defined as 'information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions.'" *Id.* (quoting *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 948 (¶ 19) (Miss. 2008)). "In reviewing the trial court's denial of a JNOV, th[e] Court must 'consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence.'" *Id.* (quoting *Spotlite Skating Rink, Inc. v. Barnes*, 988 So. 2d 364, 368 (¶ 10) (Miss. 2008)). "The denial of a JNOV will be reversed if 'the evidence, as applied to the elements of party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.'" *Id.* (quoting *White v. Stewman*, 932 So. 2d 27, 32 (¶ 11) (Miss. 2006)).

¶179. Hyundai rehashes its arguments advanced in Sections A through C, that Gilbert's opinions are "overwhelmed" by eyewitness testimony and refuted by live crash tests. For the same reasons stated above, Hyundai's arguments are without merit.

> Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.

*Mack Trucks, Inc. v. Tackett*, 841 So. 2d 1107, 1112 (¶ 20) (Miss. 2003) (quoting *Bell v. City of Bay St. Louis*, 467 So. 2d 657, 660 (Miss. 1985)). Sufficient evidence presented a jury question as to the speeds of the vehicles at impact.

    **II.**     **Whether Plaintiffs' expert's opinion that the Excel was inadequately designed to withstand the forces involved in the accident was inadmissible under *Daubert* or otherwise insufficient to support the**

**verdict.**

¶180.  In *Applewhite I*, Hyundai had argued that Mundo's opinions were unreliable.[28] *Applewhite I*, 53 So. 3d at 755-56 (¶ 21).  The Court held that the trial court did not abuse its discretion in finding Mundo's testimony sufficiently reliable for purposes of Rule 702.  *Id.* at 757 (¶ 29).

¶181.  In the present appeal, Hyundai argues that there is no legally sufficient evidence that the Excel was defectively designed.  Again, although Hyundai presents the issue as a sufficiency-of-the-evidence argument, it is in fact attacking the admissibility of Mundo's expert testimony.  *See Applewhite I*, 53 So. 3d at 753 (¶ 12).  Indeed, Hyundai argues that Mundo's opinions are inadmissible under *Daubert* because: (A) he did not calculate or account for the total energy involved in the collision, and (B) he relied on untested computer simulations to the exclusion of available field testing.

## A.    Total Energy

¶182.  As previously stated, Mundo had sufficient information to calculate the total energy

_____

[28]  Hyundai argued that Mundo's opinions were unreliable because "(1) he assumed that the Excel was defective because it separated in the crash; (2) [his] opinions did not meet the requirements of the Mississippi Product Liability Act (MPLA); (3) he based his alternative design on a single component of the vehicle using a computer program rather than 'real-world testing'; and (4) his opinions that certain welds were defective were not sufficient to establish a 'material' deviation from the manufacturer's specifications." *Applewhite I*, 53 So. 3d at 756 (¶ 23).  Hyundai took issue with Mundo's statement that "cars aren't suppose [sic] to be breaking into pieces." *Id.* (internal quotation marks omitted). Mundo had conceded that a sufficiently severe crash could cause any car to separate, but he opined that the accident was an "average, middle-of-the-road, common-place-type accident." *Id.* (internal quotation marks omitted).  The Court held that "[b]ecause this argument is, in actuality, another attempt to attack the validity of Webb's testimony, we decline to find any error respecting this issue." *Id.*

and determine whether the Excel should be able to manage the energy of the crash. Mundo testified that, although an accident reconstructionist has the final word on total energy, he had determined the energy based on the information available to him, such as the masses and velocities of the vehicles. Mundo emphasized:

> Now, understand, the weights don't change. We know what the velocities are, if I just take the rough numbers coming from the police department. I already know what the energy is. I already made a determination as to whether or not the energies involved in the crash are manageable. What I don't have is the specific fine tuning on that energy that the reconstructionists do. But that does not stop me from looking at the aggregate and total energy and being able to determine whether or not even with that maximum amount of energy, whether this vehicle could have been; should have been able to manage that energy.

Mundo was pressed on cross-examination:

> Q: Okay. And that's a way of saying you don't have point number one up here on the screen and you didn't have the energies in your report, and Mr. Gilbert yesterday didn't provide any testimony about the total energies. I'm correct about all three of those things, am I not, sir?

> A: No, you're not. I thought I just answered that. I do have the energy. I have the energy as a design engineer. I knew what the energy was when I inspected the vehicle. I knew what the mass was. I knew what the velocity. I have so many spread sheets with energy charts and graphs that I knew what it was even before I began to write a report. If you want fidelity and fine tuning of that, that belongs over in the reconstructionist's shop. I don't necessarily need it because mass and velocities that are reported are accurate enough for my work.

> Q: Okay. So basically, you don't need it then. I understand that.

> A: That's not my testimony. I'm able to gather from the police reports, from witnesses, from data on the vehicles enough information where I can calculate that myself. So I do need it. I do have it. If I wanted fidelity on that, then I wait for the accident reconstructionist to go through their expertise and tell me what the final velocities really are. So what I start out with are velocities that are much greater than what the final answer is from the reconstructionist.

94

¶183. The testimony speaks for itself. Despite Mundo's deference to the accident reconstructionist's calculation of the total energy, he repeatedly testified that he had accounted for and had calculated the total energy. Hyundai's argument is without merit.

## B.     Computer Simulations and Real-World Testing

¶184.  As to Hyundai's second argument under the present assignment of error, the Court addressed the same issue in *Applewhite I*.  *Applewhite I*, 53 So. 3d at 757 (¶¶ 27-28).  In *Applewhite I*, Hyundai argued that Mundo's alternative design was "an invalidated computer simulation of a single component."  *Id.* (¶ 27) (internal quotation marks omitted).  The Court held: "Mundo's utilization of a computer program for that purpose goes to the weight and credibility of such evidence and not to its admissibility."  *Id.* (¶ 28).  The Court also addressed Hyundai's argument that Mundo's opinions about his alternative design were not reliable without real world testing:

> In other words, Hyundai argues that Mundo was required to create a model of his alternative design and perform strength tests on the model in order to validate his opinion.  Hyundai does not argue that the computer program Mundo used was somehow flawed.  Rather, we are asked to hold that computer simulations alone are not sufficient to support expert testimony, which we decline to do.  We are not prepared to say that an expert must physically build a model of his alternative design in order to demonstrate its efficacy.  Mundo's utilization of a computer program for that purpose goes to the weight and credibility of such evidence and not to its admissibility.

*Id.*

¶185.  Hyundai raised the same argument in the first appeal.  Again, Hyundai faults Mundo for using a computer-based finite-element analysis to simulate his alternative design's reactions to forces that he input into the program.  Hyundai argues that "Mundo's computer

modeling both failed to account for the total energy involved in the crash and relied on Gilbert's reverse-engineered impact speed. By omitting the key energy data and inputting Gilbert's reverse-engineered impact speed, Mundo's Finite Element Analysis was conclusive of nothing."

¶186. Hyundai also is repeating its argument as to total energy, which we previously discussed and rejected. Indeed, Hyundai's expert design engineer, Thomas F. Patterson, Jr., testified that he had no criticisms of Mundo's calculations based the finite-element analysis model Mundo had created. As we stated in *Applewhite I*, Mundo's use of a computer program for the purpose of offering an alternative design goes to the weight and credibility of such evidence and not to its admissibility. *Id.*

### III. Whether Plaintiffs improperly circumvented the Court's mandate in *Applewhite I*.

¶187. Hyundai argues that Plaintiffs improperly circumvented the Court's mandate in *Applewhite I* by refusing to comply with the Court's directive to properly disclose the basis for Webb's faulty expert opinions and instead proceeding with a "full-scale do-over" with a different accident reconstructionist. Hyundai claims that the Court remanded for a new trial following a "full and complete disclosure" of the basis for Webb's opinions.

¶188. Hyundai's interpretation of the Court's mandate in *Applewhite I* is incorrect. Hyundai had challenged Webb's opinions in the first appeal arguing that his opinions were unreliable under Rule 702 and *Daubert*. *Applewhite I*, 53 So. 3d at 753 (¶ 12). The Court reversed and remanded for a new trial narrowly based on a discovery violation, i.e., Plaintiffs had failed to amend their discovery responses regarding Webb's opinions under Mississippi Rule of Civil

96

Procedure 26(f). *Id.* at 759 (¶ 37). The Court unequivocally refused to address the merits of Hyundai's argument because it had failed to make a contemporaneous objection. *Id.* at 755, 759 (¶¶ 19-20, 37). Although the Court stated that Hyundai's *Daubert* challenge "can be revisited on remand, in the event [Hyundai] interposes timely and appropriate objections[,]" the Court did not order a full and complete disclosure of the basis for Webb's opinions. *Id.* at 758-59 (¶¶ 34-37). The Court did not issue a "mandate" for a full and complete disclosure of Webb's opinions as characterized by Hyundai. *See id.* at 759 (¶ 37). Accordingly, Plaintiffs did not improperly circumvent the Court's mandate in *Applewhite I*.

¶189. Hyundai also argues that replacing Webb with Gilbert exposed and confirmed the unreliability of Webb's opinions. As a result, Hyundai maintains that Plaintiffs' new accident-reconstruction theory proves that Hyundai was entitled to judgment as a matter of law following the first trial and the retrial was an abuse of the appellate process.

¶190. Hyundai's argument is simply another attempt to attack the reliability of Webb's opinions. In *Applewhite I*, the Court specifically rejected Hyundai's *Daubert* challenge as to Webb's opinions in the first appeal for failure to contemporaneously object. *Applewhite I*, 53 So. 3d at 755 (¶ 20). The Court's statement that Hyundai's *Daubert* challenge *could be* revisited on appeal does not cure Hyundai's failure to properly preserve its objection to Webb's opinions during the first trial.

¶191. Plaintiffs withdrew Webb as an expert and designated Gilbert in his stead. The parties proceeded with additional discovery, and Hyundai deposed Gilbert. "A new trial provides a clean slate. The issues must be retried, and the parties may thus present evidence differently."

*White*, 932 So. 2d at 33 (¶ 18); *see also* ***Dedeaux Util. Co. v. City of Gulfport***, 63 So. 3d 514, 539 (¶ 69) (Miss. 2011). Hyundai's challenge to the merits of Webb's opinion was not properly before the Court in ***Applewhite I***, nor is it properly before the Court here. Accordingly, Hyundai's argument is without merit.

## IV.     Whether the trial court erred in excluding evidence that the Excel's occupants were not properly seat-belted.

¶192. In the previous appeal, Hyundai argued that the trial court had erred in excluding seat-belt evidence in the first trial, but the Court did not address it because it reversed and remanded for a new trial on a different ground. ***Applewhite I***, 53 So. 3d at 751-52 (¶¶ 1, 8). It was undisputed that the Excel's occupants were not properly seat-belted.

¶193. In a proffer made in the first trial, Plaintiffs' expert Dr. Burton had opined that Stewart, who was seated in the back seat of the Excel, was not wearing a seat belt at all. Dr. Burton agreed that had Stewart been properly restrained, it would have "minimized the risk of his fatal injuries[.]" Dr. Burton also opined that, even if the seat belt did keep Stewart inside the vehicle, he was still at risk for suffering fatal injuries because the vertical occupant space was not maintained. Dr. Burton also testified that the Excel was equipped with automatic shoulder belts and manual lap belts. Dr. Burton had opined that Applewhite and Cooper, who were seated in the front seats, were not wearing their manual lap belts. Dr. Burton determined that Applewhite and Cooper were improperly seat-belted with automatic shoulder belts only, which Dr. Burton stated was just as dangerous as not being belted at all. Dr. Burton testified that the automatic belt system for the front two passengers was congressionally mandated in the late 1980s to the early 1990s; however, in 1996, manufacturers were prohibited from

98

manufacturing vehicles with the automatic shoulder belt and manual lap belt combination due to the dangers inherent in the belt combination. Dr. Burton concluded that, had Applewhite and Cooper been properly restrained, there would have been no benefit in the crash.

¶194. Before the second trial, Plaintiffs filed a motion in limine to prohibit all evidence that the Excel's occupants were not properly seat-belted. Conversely, Hyundai filed a motion in limine to allow seat-belt evidence. The trial court granted Plaintiffs' motion in limine and denied Hyundai's motion in limine, and thus excluded all seat-belt evidence subject to Hyundai's responding to Dr. Burton's testimony regarding the "packaging" of the occupants.

¶195. Hyundai argues that the trial court erred in excluding Hyundai's evidence that the Excel's occupants were not properly seat-belted because evidence of seat-belt misuse was directly relevant for purposes other than contributory or comparative negligence, namely, to rebut Plaintiffs' causation and design-defect theories. Plaintiffs argue that the trial court's exclusion of seat-belt nonusage was proper because the evidence would serve only to prejudice Plaintiffs and confuse the jury.

¶196. The Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion, and we will not reverse unless the erroneous admission or exclusion affects a substantial right of the party. *Loyacono v. Travelers Ins. Co.*, 163 So. 3d 932, 936 (¶ 16) (Miss. 2014). "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the case." Miss. R. Evid. 401. Although relevant, the trial court may exclude the evidence "if its probative value is substantially outweighed by a danger of one or more of the

99

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Miss. R. Evid. 403.

¶197. Mississippi Code Section 63-2-3 provides, in part: "Failure to provide and use a seat belt restraint device or system shall not be considered contributory or comparative negligence, nor shall the violation be entered on the driving record of any individual." Miss. Code Ann. § 63-2-3 (Rev. 2013). The Court has cautioned that Section 63-2-3 "should be enforced as written and is not given overbroad application, lest the statute be considered an improper evidentiary statute rather than a substantive one." *Herring v. Poirrier*, 797 So. 2d 797, 805-06 (¶ 24) (Miss. 2000) (citing *Estate of Hunter*, 729 So. 2d at 1267–68 (¶ 6).

¶198. In *Estate of Hunter*, the plaintiffs argued that the trial court had erred in admitting evidence that passengers were not wearing seat belts in a car accident and by instructing the jury that seat belt nonusage constituted contributory negligence. *Estate of Hunter*, 929 So. 2d at 1267 (¶ 6). The Court recognized that, although Section 63-2-3 provides that the nonusage of seat belts may not be "'considered contributory or comparative negligence,' the statute does not forbid the admission of evidence of seat belt usage outright." *Id.* (citing Miss. Code Ann § 63-2-3 (1996)). The Court held:

> This Court concludes that evidence of seat belt non-usage *may* constitute relevant evidence in *some* (but by no means all or even most) cases, so long as (1) the evidence has some probative value other than as evidence of negligence; (2) this probative value is not substantially outweighed by its prejudicial effect and is not barred by some other rule of evidence and (3) appropriate limiting instructions are given to the jury, barring the consideration of seat belt non-usage as evidence of negligence.

*Id.* at 1268 (¶ 11) (citation omitted). The Court held that the trial court violated Section 63-2-

100

3 by instructing the jury that seat belt nonusage constituted contributory negligence. *Id.* at 1268-69 (¶ 13).

¶199. The Court in *Palmer v. Volkswagen of America, Inc.*, 904 So. 2d 1077 (Miss. 2005), echoed the Court's conclusion in *Estate of Hunter*, holding that when evidence of nonuse of seat belts is offered for another purpose other than negligence, provided it passes all other tests of admissibility, it may be admitted; however, the Court continued, the trial court should caution the jury and instruct it on the limited use of the evidence. *Palmer*, 904 So. 2d at 1094 (¶ 69); *see also* *Estate of Hunter*, 729 So. 2d at 1268 (¶¶ 11-12).

¶200. Hyundai argues that Dr. Burton's testimony that the occupants of an intact Excel would have had an 80 percent chance of surviving a delta-v of thirty-five miles per hour was unfair because his testimony was based on probability charts that used statistical data, which included accidents involving occupants who were belted. Dr. Burton testified that the Malliaris-Digges and DeBloise chart used data from the National Accident Sampling Survey (NASS) compiled by the National Highway Traffic Safety Administration (NHTSA) showing the relationship between the severity of crash injuries and crash attributes, namely, the relationship between crash casualties and the delta-v involved in the crash. Dr. Burton's expert opinion was not based solely on the probability chart. Rather, Burton opined that, "statistically, *and* based on the evidence in th[e] case, they would have survived a delta-v ranging from thirty-four to thirty-seven miles per hour."

¶201. Later, during Hyundai's case-in-chief, while Dr. Germane was on the stand, Hyundai claimed that the door had been opened to seat-belt evidence in light of using the statistics

because the probability chart included data from crashes in which the occupants were properly belted and not properly belted.

¶202. The trial court reconsidered and denied Hyundai's motion to allow seat-belt evidence under Rule 403. The trial court did not articulate the prejudicial effect, but the Court indicated that introducing seat-belt evidence would have limited probative value.

¶203. Hyundai acknowledges that, while its expert, Dr. Germane, was permitted to offer the NASS data showing that 77 percent of all crash fatalities occurred at a delta-v of thirty-nine miles per hour or less in frontal impacts from 1988 to 2006, the data included both "belted occupants" and "unbelted occupants." The jury was prevented from hearing that the NASS data showed that approximately 81 percent to 84 percent of all crash fatalities occurred at a delta-v of thirty-nine miles per hour or less in frontal impacts from 1998 to 2006 involving "unbelted occupants." For "belted occupants," the figure was approximately 70 percent to 73 percent.

¶204. The small difference in the statistics shows a limited probative value based on the record before us. "In the absence of a meaningful proffer, we cannot place the lower court in error." *Univ. of Miss. Med. Ctr. v. Foster*, 107 So. 3d 149, 155 (¶ 37) (Miss. 2013) (internal quotation marks omitted) (quoting *Knotts ex rel. Knotts v. Hassell*, 659 So. 2d 886, 891 (Miss. 1995)). The Court is unable to determine whether "belted occupants" includes *properly* belted occupants or *improperly* belted occupants, such as Applewhite and Cooper, who were belted with shoulder belts only. Moreover, Dr. Germane testified that the NASS charts, which classified accidents as "frontal" and "side," did not squarely apply because the

102

crash fell somewhere between a frontal impact and a side impact. Also, Dr. Burton described the crash as an "angled frontal impact."

¶205. Hyundai also argues that it was unfairly prevented from introducing evidence that Stewart, who was partially ejected, would have "minimized the risk of fatal injuries" by wearing a seat belt. However, in the proffer in the first trial, Dr. Burton did not elaborate as to what extent Stewart's risk of fatality would have been minimized. Without further development as to the extent of the "minimized" risk, we are unable to say the trial court abused its discretion by excluding the seat belt evidence as to Stewart. *See **id.***

¶206. Hyundai argues that it was unfair that the jury was unable to hear that the Lincoln's occupants were properly belted because Plaintiffs' "theme" throughout the trial was that the Lincoln performed and the Excel did not, i.e., the Lincoln's passengers survived, but the Excel's occupants did not. But the jury was not permitted to hear that the Lincoln's passengers were properly seat-belted, but the Excel's occupants were not. Thus, the argument is without merit.

¶207. I agree with Hyundai that seat-belt evidence was relevant under Rule 401 because it had a tendency to show that the Excel's occupants' chance of survivability was more likely according to the statistics relied on in part by Dr. Burton in offering his expert opinion. However, the trial court concluded that the probative value of seat-belt nonusage was substantially outweighed by the danger of unfair prejudice under Rule 403. I cannot say that the trial court abused its discretion by excluding seat-belt evidence under Rule 403 given the minimal probative value of the evidence based on the record before us.

## V. Whether the trial court erred in excluding Hyundai's photographic evidence.

¶208. Hyundai argues the trial court erred in excluding photos of other vehicles of various makes, models, and sizes that had been torn apart in similar collisions.[29] Plaintiffs respond by arguing that the trial court did not abuse its discretion by excluding the photos because Hyundai failed to show substantial similarity between the accident here and the other accidents.

¶209. During trial, Hyundai sought to introduce photos of vehicles of various makes and models that have torn apart in other accidents. The trial court allowed *testimony* regarding other vehicles that have separated in other accidents; however, the trial court excluded *photos* of other vehicles that have separated in other accidents. In applying Rule 403, the trial court found that the probative value of photos of other split-apart vehicles in other accidents was substantially outweighed by the danger of unfair prejudice, and displaying vehicles of various makes and models would be confusing to the jury.

¶210. Hyundai argues that Plaintiffs took unfair advantage of the exclusion of the photos by maintaining the theme throughout trial that "a vehicle properly designed is not supposed to break apart at less than highway speeds in an accident." Hyundai's chief complaint is that Plaintiffs' counsel took full and unfair advantage of the trial court's ruling excluding the photos culminating in an "inflammatory—and extremely misleading—remark" during closing argument. In closing, Plaintiffs' counsel stated:

---

[29] In the first trial, the trial court initially had excluded all evidence of other split-apart accidents. However, the trial court ultimately allowed Hyundai to elicit testimony regarding other accidents involving vehicles splitting apart; it excluded photos.

This particular case and you'll hear, I'm sure, that people said, well, I know other accidents where vehicles had broken apart. The defense had suggested that. They haven't brought you one piece of evidence in this case to suggest to you that a single one of those other accidents involved a car breaking into three pieces at less than highway speeds.

¶211. After Hyundai finished its closing argument, but before Plaintiffs began their remaining closing argument, Hyundai moved for a mistrial based on Plaintiffs' counsel's remarks. After hearing arguments of counsel, the trial court found that Plaintiffs' counsel's comments did not appear so prejudicial as to warrant a mistrial and denied the motion.

¶212. The Court reviews a trial court's "decision to admit or exclude evidence for an abuse of discretion, and we will not reverse unless the erroneous admission or exclusion affects a substantial right of the party." *Loyacono*, 163 So. 3d at 936 (¶ 16) (citing *Robinson Prop. Group, L.P. v. Mitchell*, 7 So. 3d 240, 243 (Miss. 2009)). "Th[e] Court reviews a grant or denial of a motion for mistrial for an abuse of discretion." *Estate of Gibson ex rel. Gibson v. Magnolia Healthcare, Inc.*, 91 So. 3d 616, 629 (¶ 37) (Miss. 2012) (citing *United Servs. Auto. Ass'n v. Lisanby*, 47 So. 3d 1172 (Miss. 2010)). The trial court is in the "best position for determining the prejudicial effect of an objectionable remark." *Id.* (internal quotation marks omitted) (quoting *Lisanby*, 47 So. 3d at 1184).

¶213. I cannot say that the trial court abused its discretion by excluding photos of torn-apart vehicles in other accidents. I am not persuaded by Hyundai's claim that the trial court's exclusion of the photos "gave the [P]laintiffs carte blanche to pursue their improper theory that no car should tear apart in a crash at less than highway speeds." However, Hyundai was allowed to present expert testimony that other types of vehicles, including vehicles that were

105

reasonably designed, would have been torn apart in similar accidents. Hyundai's expert design engineer, Patterson, testified that other types of reasonably designed vehicles would have been torn apart in the accident. Moreover, Mundo testified that the Excel was "defective and unreasonably dangerous as demonstrated by the vehicle breaking into three pieces in a forseeeable frontal impact[,]" but he admitted that "[w]ith enough energy, any vehicle can separate."

¶214. Plaintiffs' counsel's remark during closing statements was close to crossing the proverbial line of the trial court's evidentiary ruling. However, Hyundai had offered evidence, through expert testimony, that other vehicles, even those reasonably designed, could break apart in the accident, and it was free to respond to Plaintiffs' counsel's remark in its own closing statements.

¶215. I would hold that the trial court did not abuse its discretion by determining that displaying photos of other torn-apart vehicles would be confusing to the jury under Rule 403. Moreover, I cannot say the trial court abused its discretion by denying Plaintiffs' motion for a mistrial based on the statements made during Plaintiffs' closing argument.

## VI. Whether Hyundai was denied the right to a fair trial by an impartial jury.

¶216. Hyundai argues that it was denied a fair trial by an impartial jury because the venire was assembled pursuant to an informal, off-the-books process that violated Mississippi jury statutes and because evidence strongly indicates that the jury was improperly influenced by a member of Plaintiffs' trial team. Because the latter issue is addressed above, I do not revisit it here.

¶217. "Litigants are entitled to a fair trial, but not a perfect trial." *Ekornes-Duncan v. Rankin Med. Ctr.*, 808 So. 2d 955, 959 (¶ 15) (Miss. 2002). "There is no question that plaintiffs and defendants are entitled to a fair and impartial jury . . . ." *Page v. Siemens Energy & Automation, Inc.*, 728 So. 2d 1075, 1081 (¶ 24) (Miss. 1998). "Both federal and state constitutions secure to persons the right to be tried before a fair and impartial jury. Selection of a jury from a representative cross-section of the community is an essential component of that right." *Adams v. State*, 537 So. 2d 891, 893 (Miss. 1989) (citing *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)).

¶218. "Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness for public confidence in the fairness of jury trials is essential to the existence of our legal system." *Page*, 728 So. 2d at 1082 (internal quotation mark omitted) (citing *Toyota Motor Corp. v. McLaurin*, 642 So. 2d 351, 356 (Miss. 1994)). "Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions." *Id.* (internal quotation mark omitted) (quoting *McLaurin*, 642 So. 2d at 356).

¶219. At a postjudgment hearing, the circuit clerk, Charles A. Oakes, verified that in the present case, 348 names were summoned, which included several unexplained no shows and several who had moved from the county or could not be located. Of the 348, the circuit clerk unilaterally excused at least forty-five for hardship outside of court and without consulting the trial court.[30] At least ten of the first fifty-three jurors summoned were granted hardship

---

[30] Out of the 348 summoned, the clerk also unilaterally excused at least thirty-four for age upon their request and several more for medical reasons upon their request.

exemptions by the clerk.

¶220. Oakes testified that a senior circuit court judge in the district had authorized every clerk in the district to accept potential jurors' excuses in writing and put them in the file, and the trial court would have it if necessary. Oakes testified that he did not consult with the trial judge when making decisions about hardship, age, or any other reasons potential jurors may have written down. Oakes testified that the clerk's authority unilaterally to excuse jurors had been the practice in the district for fifteen to twenty years. Mississippi Code Section 13-5-2 provides:

> It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity in accordance with this chapter to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose. A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin, or economic status.

Miss. Code Ann. § 13-5-2 (Rev. 2019).

¶221. Mississippi Code Section 13-5-87 provides:

> All the provisions of law in relation to the listing, drawing, summoning and impaneling juries are directory merely, and a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn, and it shall have the power to perform all the duties devolving on the jury.

Miss. Code Ann. § 13-5-87 (Rev. 2019).

¶222. Mississippi Code Section 13-5-23(1) provides:

> All qualified persons shall be liable to serve as jurors, unless excused by the court for one (1) of the following causes:
>
> > (a) When the juror is ill and, on account of the illness, is

108

incapable of performing jury service;

(b) When the juror's attendance would cause undue or extreme physical or financial hardship to the prospective juror or a person under his or her care or supervision; or

(c) When the potential juror is a breast-feeding mother.

Miss. Code Ann. § 13-5-23(1) (Rev. 2019). A clerk may grant excuses for medical unfitness outside of open court to individuals who provide a certificate of a licensed physician under Section 13-5-23(2) and for individuals over sixty-five years of age who provide supporting information allowing the clerk to determine the validity of the individual's age, under Mississippi Code Section 13-5-25 (Rev. 2019).

¶223. Particularly relevant here is that, under Section 13-5-23(c), a trial judge shall decide whether an individual qualifies for the undue or extreme financial hardship excuse under Section 13-5-23(1)(b). Hyundai argues that Section 13-5-23(3)(c) requires hardship excuses to be made *under oath and in open court*. However, no oath or open-court requirement exists in the subsection. Rather, Sections 13-5-23(1)(b) and -23(3)(c) clearly provide that the *trial judge* must decide whether to excuse individuals from jury service based on hardship.

¶224. Hyundai relies on *Page*, 728 So. 2d 1075, in support of its argument that the circuit clerk's unilateral decisions to excuse individuals warrant a new trial. In *Page*, the jury returned a verdict in favor of the defendant, Siemens, in a personal-injury lawsuit filed by Ronnie and Lavon Page for personal injuries and loss of consortium. *Id.* at 1077 (¶¶ 2-3). The trial court denied the Pages' posttrial motion for relief from the judgment under Mississippi Rule of Civil Procedure 60(b)(3) and 60(b)(6) in which they had argued that they

were denied a fair and impartial jury because qualified jurors were excluded from the jury list, and potential jurors who were over sixty-five, as well as potential jurors who claimed medical, financial, or work hardships, were unilaterally excused by the clerk before the actual voir dire examination. *Id.* at 1077 (¶ 1). "Joe Martin, the circuit clerk, admitted that he directed the computer programmer to exclude from the jury lists all jurors who had been summoned to jury duty in either circuit or county courts within the preceding two years, whether they actually had served or not." *Id.* at 1080 (¶ 17). The Court stated, "[e]ven if the clerk's office claims expediency as a purpose, this does nothing to change the fact that citizens who were entitled, and who may want, to serve on juries have been intentionally excluded." *Id.*

¶225. The Court held that the clerk's practice of excluding certain citizens from the venire pool required that the case be reversed and remanded for a new trial, with special instructions to the circuit clerk to follow the statutory guidelines for jury selection. *Id.* at 1082 (¶ 28). In reversing, the Court expressed its concern that "[a]pparently, our earlier mandate in *Adams* [*v. State*, 537 So. 2d 891, 893 (Miss. 1989),] has gone unheeded." In *Adams*, the Court reversed and remanded for a new trial because the Carroll County deputy circuit clerk unilaterally struck from the jury list all persons over the age of sixty-five as well as all persons who had served on a jury with in the preceding two years. *Adams*, 537 So. 2d at 892. In *Adams*, the deputy circuit clerk struck persons from the jury venire, first, without obtaining authority of the court and, second, without notifying the affected individuals that their names had been drawn for jury duty or requiring that the persons claim their statutory privilege to be exempt from jury service. *Id.* The Court stated that Section 13-5-25 "makes clear that

110

neither the circuit court—and certainly not the deputy circuit clerk—have authority to act unilaterally and strike from the jury list persons over sixty-five and who have served within the past two years." *Id.* at 893-94. The Court expressed that such persons are eligible for jury service and have every lawful right and authority to serve if called and selected. *Id.* at 894. The Court held the clerk's practice was completely contrary to law (as opposed to substantial compliance or minor deviation) and reversed and remanded for a new trial. *Id.* at 895. The Court explained that the statutory language is clear: "a person over sixty-five or who may have served on a jury within the past two years shall be exempt 'if he claims the privilege.'" *Id.* at 894-95. "Such persons are eligible for jury service and are not to be exempt unless they exercise their statutory privilege and personally claim exemption." *Id.* at 895.

¶226. The *Page* Court, in dicta, addressed the pertinent issue in the present case:

> While the Pages further allege that the circuit clerk also excused individuals who claimed medical conditions, financial hardships, and work hardships without requiring them to provide an affidavit or an excuse in open court, we have reviewed the testimony of Joe Martin and cannot find a clear statement that such affidavits or open court excuses were not required. Nonetheless, if true, such exclusion by anyone except the circuit court judge would also be problematic. *See* ***Harris v. State***, 406 So. 2d 823, 824 (Miss. 1981).

***Page***, 728 So. 2d at 1081 n.2.

¶227. Plaintiffs argue that Hyundai waived the argument by failing to object before the jury's empaneling or during the jury-selection process. Plaintiffs argue that, once the jury was empaneled, Hyundai had waived its objection under Section 13-5-87. Hyundai responds that it raised the issue in its Rule 59 motion at the earliest possible juncture (as opposed to the appellants in *Page*, who filed a Rule 60(b) motion) when it first became aware of the circuit

clerk's actions, and like the appellants in *Page*, it was not in position to discover the circuit clerk's practices. *Id.* at 1078, 1080-81 (¶¶ 8, 20).

¶228. Plaintiffs also argue that there was no substantial deviation from the merely directory jury selection laws, and Hyundai has made no showing of fraud, prejudice, or flagrant violation of duty so as to amount to fraud. *See Moore v. State*, 816 So. 2d 1022, 1026 (¶ 10) (Miss. Ct. App. 2016). In *Moore*, the Court of Appeals held:

> The Mississippi Supreme Court has interpreted [Section 13-5-87] to mean that substantial compliance with the statute will not warrant the quashing of the venire. *Griffin v. State*, 494 So. 2d 376, 379 (Miss. 1986). Additionally, the [C]ourt has stated that a jury panel should not be quashed unless the defendant can show that the failure to comply with the statute amounts to "actual fraud, prejudice, or such a flagrant violation of duty as to amount to fraud." *Pulliam v. State*, 515 So. 2d 945, 948 (Miss. 1987). *See also Harris v. State*, 406 So. 2d 823, 824 (Miss. 1981).

*Moore*, 816 So. 2d at 1026 (¶ 10).

¶229. In *Pulliam v. State*, a criminal defendant argued the trial court had erred by improperly excusing jurors prior to their appearance in open court. *Pulliam v. State*, 515 So. 2d 945, 948 (Miss. 1987). Although the Supreme Court did not reverse on the issue, the Court stated: "[N]on-compliance with Section 13-5-23, Mississippi Code Annotated (Supp. 1985), on exemption of jurors does not warrant the quashing of the venire unless there is a showing of actual fraud, prejudice, or such a flagrant violation of duty as to amount to fraud." *Id.* Furthermore, in *Griffin*, the Court held: "We are of the opinion that there was compliance with the statute by the circuit clerk, or certainly a substantial compliance; that there was no indication of prejudice or fraud in the method used; and that there is no merit in the assignment of error." *Griffin*, 494 So. 2d at 379 (Miss. 1986) (citing *Harris v. State*, 406 So.

112

2d 823 (Miss. 1981)).

¶230. The chief concern in *Page* and *Adams* centered around jurors' not being given the opportunity to be summoned in the first instance; here, the clerk unilaterally excused jurors upon *their* request without consulting the trial judge as to each excuse. The clerk's practice of excusing summoned jurors at their request without consulting the trial judge (who had authorized the practice) does not equate to the intentional and systematic exclusion of potential jurors based upon any particular status as did clerks in *Page* and *Adams*. *See Cooper v. State*, 200 So. 3d 1065, 1073 (¶ 29) (Miss. Ct. App. 2016) (holding that the record reflected no intentional or systematic exclusion of potential jurors or any exclusion of potential jurors based on any status or category).

¶231. The Court's decision in *Parker v. State*, strikes a balance between the trial court's duty to adhere to the jury-selection provisions while acknowledging the Legislature's unequivocal declaration that "[a]ll the provisions of law in relation to the listing, drawing, summoning and impaneling juries are *directory merely*[.]" *Parker v. State*, 29 So. 2d 910 (Miss. 1947) (emphasis added) (internal quotation mark omitted) (quoting Miss. Code (1942) § 1798). Indeed, now Section 13-5-87 assures that "a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn, and it shall have the power to perform all the duties devolving on the jury." Miss. Code Ann. § 13-5-87.

¶232. The *Parker* Court held that the trial judge has a duty to require compliance with the jury-selection statute except when it is impracticable to do so. *Parker*, 29 So. 2d at 912. "For

113

an error to work a reversal it must be shown that the defendant was actually prejudiced or the circumstances be such that the court must presume prejudice." *Id.* at 913 (citing *Cody v. State*, 148 So. 627 (Miss. 1933)). The Court determined that it was not shown that the appellant was prejudiced because it was "pure speculation whether [the] excused jurors would have been more favorable to the appellant[.]" *Id.* The Court also stated that there was no showing that the jury finally empaneled that tried the defendant was not a fair and impartial jury. *Id.* Here, the circuit clerk unilaterally excusing jurors at their request without consulting the trial judge constituted a violation of Section 13-5-23(3)(c). Despite the violation of the merely "directory" jury-selection provision, the "jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn, and it shall have the power to perform all the duties devolving on the jury." Miss. Code Ann. § 13-5-87. Hyundai has not shown that it was prejudiced or that the circumstances were such that the Court must presume prejudice based on the violation of Section 13-5-23(3)(c). *See Pulliam*, 515 So. 2d at 948; *Griffin*, 494 So. 2d at 379. Because there was no showing that the jury finally empaneled that rendered a verdict was not a fair and impartial jury, I find no reversible error.

VII. **Whether the verdict, which fails to apportion any fault to the Excel's driver, reflects improper prejudice or passion.**

¶233. In *Applewhite I*, Hyundai argued that "the jury's allocation of 100% fault to Hyundai demonstrates the jury's passion and prejudice in reaching its verdict." *Applewhite I*, 53 So. 3d at 752 (¶ 8). However, the Court did not address the issue because it reversed on a different ground. *Id*. Here, Hyundai again argues that the jury's failure to apportion any fault

114

to the Excel's driver, Applewhite, whose negligence indisputably caused the accident, was clearly the product of passion and prejudice. Hyundai also argues that the jury's failure to apportion any fault to Applewhite is contrary to the overwhelming weight of the evidence.

> This Court may disturb the jury verdict only if the Court "finds that the damages are excessive or inadequate for the reason that the jury was influenced by bias, prejudice, or passion, so as to shock the conscience or that the damages awarded were contrary to the overwhelming weight of credible evidence."

*Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.*, 725 So. 2d 902, 920 (¶ 71) (Miss. 1998) (quoting *Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67, 76 (Miss. 1996)).

¶234. "Mississippi is a pure comparative negligence state." *Coho Res., Inc. v. Chapman*, 913 So. 2d 899, 911 (¶ 36) (Miss. 2005) (citing Miss. Code Ann. § 11-7-15 (Rev. 2004)). "Under the comparative negligence doctrine, negligence is measured in terms of percentage, and any damages allowed shall be diminished in proportion to amount of negligence attributable to the person for whose injury, damage or death recovery is sought." *Id.* (citing *Burton ex rel. Bradford v. Barnett*, 615 So. 2d 580, 582 (Miss. 1993)). "[A] plaintiff, though himself negligent, may still recover from a defendant whose negligence contributed to his injuries." *Id.* (citing *Blackmon v. Payne*, 510 So. 2d 483, 486 (Miss. 1987)). "The Mississippi Supreme Court has held that a comparative negligence defense is available in crashworthiness suits." *Coleman v. Ford Motor Co.*, 70 So. 3d 223, 226 (¶ 6) (Miss. Ct. App. 2011) (citing *Estate of Hunter*, 729 So. 2d 1264). In *Estate of Hunter*, the Court outlined the proper instructions as to the relationship between allocation of fault and crashworthiness:

> This Court also concludes that, on remand, the trial court should specifically instruct the jury that [the vehicle manufacturer] may be held liable for crashworthiness defects even if the defects did not cause or contribute to the

115

*initial crash*.  An instruction in this regard serves to acknowledge the unique nature of the crashworthiness lawsuit, while at the same time permitting the defendant to argue that responsibility for the plaintiffs' injuries should be allocated elsewhere.  This Court further directs that the jury on remand shall consider the fault of all parties who may have contributed to the plaintiffs' injuries[.]

*Estate of Hunter*, 729 So. 2d at 1279-80 (¶ 56) (emphasis added).

¶235.  In the case *sub judice*, the trial court did not foreclose Hyundai from presenting a

defense of comparative negligence.  Indeed, the jury was instructed as to the duty of an

operator of an automobile and comparative fault:

> The operator of a automobile has a duty to keep it under proper control.  If you find from the preponderance of the evidence that Dorothy Mae Applewhite's failure to keep the automobile under control was the sole cause of the death, then your verdict must be for Hyundai. If you believe the failure to keep the automobile under control was only a proximate contributing cause of the death, then you must consider a percentage of fault for Dorothy Mae Applewhite and so indicate on the verdict form.

The jury also was instructed as to the unique nature of a crashworthiness lawsuit:

> You are instructed that should you find for the plaintiffs in the case on the question of liability, you must confine your damage verdict to reasonable compensation for the injuries and damages actually sustained, if any, by plaintiff as a result of the death of their decedents. . . .  [D]efendants may not be held liable for injury that this crash would have caused anyway, even without the defect.  Only enhanced injury, injury caused by a defect and which would have occurred but for the defect is compensable.  And enhanced injury is injury over and above that which would have occurred without the defect – alleged defect.  The enhanced injury alleged in this case is death.  Plaintiffs contend that but for the alleged defects in the Excel, the decedents would have survived the crash.  Mere possibilities are not sufficient for a verdict.  Therefore, the mere possibility that the defendants might have survived the crash without the alleged defect is not sufficient. Plaintiffs must prove that in the absence of the alleged defects, their decedents would have had a reasonable probability of survivable [sic].

¶236.  Over the objection of Plaintiffs, the jury was given the option of assigning fault to the

116

Excel's driver, Applewhite. The following instruction was given to the jury:

> Assign to each person or entity listed below the percentage of fault you attribute in proximately causing or contributing to the death of DOROTHY MAE APPLEWHITE, CECELIA COOPER [sic], AND ANTHONY STEWART
>
> _____ Hyundai Motor America/Hyundai Motor Company
>
> _____ Dorothy Mae Applewhite
>
> Your percentages must total 100%.

¶237. The trial court properly followed the instructions outlined by the Court in *Estate of Hunter* when instructing the jury on the issues of comparative fault and crashworthiness. It essentially was undisputed that Applewhite's driving caused the initial crash. Gilbert admitted that there was nothing inconsistent with defense's theory that the driver was falling asleep. Both reconstructionists agreed that the Excel was out of control and going on and off the road immediately before the collision. There was no dispute that the southbound Excel crossed the center line of the highway and collided into the northbound Lincoln in the northbound lane.

¶238. Despite the evidence that Applewhite's driving may have caused or contributed to the initial crash, Hyundai may be held liable for crashworthiness defects even if the defects did not cause or contribute to the initial crash. *See Estate of Hunter*, 729 So. 2d at 1279 (¶ 56). The trial court properly instructed the jury that Hyundai may not be held liable for injuries that this crash would have caused anyway, even without the alleged defect. The trial court ensured that only enhanced injuries, injuries over and above that which would have occurred without the alleged defect, were compensable. Plaintiffs claimed that, but for the alleged design

117

defects in the Excel, the decedents would have survived the crash.

> A defendant's negligence which is found to be the cause in fact of a plaintiff's damage will also be the legal cause of that damage, provided the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act.

*Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (Miss. 2007) (citing Dobbs, The Law of Torts § 180 (2000)). While issues surrounded proximate cause and the jury's having to conclude that death is not a foreseeable or reasonably expected consequence of crossing the center line and collided head-on with another car, there is, however, more to the question of proximate cause than whether an injury is foreseeable.

> [T]he question of forseeability is different from the question of causation. The causation question is whether the [defendant's] negligence caused or substantially contributed to [the plaintiff's injury]. . . . By contrast, forseeability presents the question of whether [the injury] is the type of damage which reasonably should be *anticipated* (or foreseen before the fact) as a result of [the negligent act].

*City of Jackson v. Law*, 65 So. 3d 821, 834 (¶ 53) (Miss. 2011) (alterations in original) (quoting *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 712–13 (Miss. 2005)). Accordingly, finding that an injury is a foreseeable consequence of an action does not require a finding of proximate cause.

¶239. In the case *sub judice*, the jury found that the design defect urged by the plaintiffs caused the deaths of the decedents. The jury accepted Plaintiffs' theory of the case that whatever was the cause in fact of the collision, the only proximate cause of death was the Excel's design defect. In a crashworthiness case, the jury is free to do so. *Estate of Hunter*, 729 So. 2d at 1279 (¶ 56). Hyundai's choice, during closing arguments, not to ask the jury

to find comparative negligence for the Excel crossing the center line buttresses the point that the jury did its job and chose which of two theories it considered the more credible. Quite simply, the theory that Applewhite negligently operated her vehicle was not Hyundai's theory of the case: that whatever the cause of the crash, the decedents would have died regardless of any design defect.

¶240. Because Plaintiffs' recoverable damages were limited to enhanced injury, i.e., death, caused by the alleged design defect rendering the Excel not crashworthy, it was not unreasonable for the jury to find Hyundai 100 percent at fault for the enhanced injuries of the Excel's occupants. The jury acted within its authority to allocate 100 percent of fault for the present crashworthiness case for the enhanced injuries. Accordingly, the verdict was not against the overwhelming weight of the evidence.

## CONCLUSION

¶241. I would affirm the jury verdict in the above-styled case.

**KITCHENS, P.J., JOINS THIS OPINION IN PART.**